Jacqueline **CORNELIUS** et al.,
Plaintiffs,

v.

**CITY OF PARMA** et al.,
Defendants,

**UNITED STATES**, Plaintiff,

v.

**CITY OF PARMA**, Defendant.

Nos. C 73–437, C 73–439.

United States District Court,
N. D. Ohio, E. D.

Feb. 22, 1974.

Avery S. Friedman, Cleveland, Ohio, Jay Mulkeen, Nat. Committee Against Discrimination in Housing, Washington, D. C., for Jacqueline Cornelius.

Norman P. Goldberg, David L. Norman, Michael E. Barrett, Dept. of Justice, Washington, D. C., for the U. S.

Andrew Boyko, Robert R. Soltis, Parma, Ohio, for City of Parma.

## MEMORANDUM OPINION AND ORDER

BATTISTI, Chief Judge.

## I. INTRODUCTION

These are consolidated cases challenging housing practices pursued by the City of Parma, Ohio.

C 73–439 (hereinafter referred to as the Government's suit) was instituted by the Attorney General, on behalf of the United States, pursuant to Section 813 of the Fair Housing Act of 1968, 42 U.S.C. § 3613 and 28 U.S.C. § 1345. The Government alleges that it has been the policy of Parma to exclude black persons from residing within its limits in any significant numbers, and that the City in accordance with this policy has engaged in acts and practices which effectively operate to deny equal housing opportunity to blacks on account of race. More specifically, the Government charges that Parma in the fall of 1971 refused to issue a building permit to allow the construction of a federally assisted apartment development by Forest City Enterprises, an Ohio corporation, for the reason that the development would have provided opportunity for a substantial degree of desegregated occupancy within the boundaries of the City. Additionally, the Government challenges ordinances enacted by initiative vote of the Parma electorate at about the same time as the apartment development was blocked by Parma officials.

One of these ordinances generally limits the height of residential buildings to

be constructed in Parma to thirty-five feet. The other provides that "no low-rent housing project shall be developed, constructed or acquired in any manner in the City by any public body or authority, nor shall approval be granted for participation in the Federal Rent Supplement Program, until a majority of the qualified electors of the City voting upon such issue approve such project or such participation by voting in favor thereof at an election to be held for that purpose or at the next primary or general election." [1]

It is contended that these ordinances, although facially neutral, were enacted for the purpose of preventing the construction in Parma of racially integrated housing for persons of low and moderate income and, in the context of Parma's longstanding posture toward such housing, have had such an effect.

Parma's conduct, it is alleged, constitutes a pattern and practice of resistance to the full enjoyment of rights secured by Title VIII of the Fair Housing Act of 1968, 42 U.S.C. § 3601 et seq., and by the Thirteenth and Fourteenth Amendments to the United States Constitution, as well as a denial of rights to equal opportunity in housing, raising an issue of general public importance.

---

1. The two ordinances have been incorporated in Parma's municipal building code. The height limitations ordinance is contained in Section 1529.37 of the code. It provides:
"MAXIMUM HEIGHT OF RESIDENTIAL STRUCTURES.
No building designed for and occupied in whole or in part as a residence, including, but not limited to, single-family houses, dwelling houses, multiple dwellings, lodging houses, apartment houses, hotels and condominiums, shall exceed thirty-five feet in height. (Initiative. Passed 11-2-71.)"
The referendum requirement ordinance is contained in Chapter 1528 of the code. Its full text is as follows:
"1528.01 DEFINITIONS.
For the purpose of this chapter:
(a) 'Low rent housing project' means:
(1) Any development composed of one or more dwellings, apartments or other living accommodations for persons of low income, financed in whole or in part by the Federal Government or a State public body or authority or to which the Federal Government or a State public body or authority extends assistance by supplying all or part of the labor, by guaranteeing the payment of liens, or otherwise, or
(2) Any development composed of one or more dwellings, apartments or other living accommodations for persons of low income, developed, constructed or acquired by a private individual or a nonpublic body, and to which the Federal Government will make rent supplement payments on behalf of low income families or individuals eligible for public housing.
(b) 'Persons of low income' and 'low income families' means persons or families who lack the amount of income which is necessary to enable them, without financial assistance, to live in decent, safe and sanitary dwellings, without overcrowding, as determined by the public body or authority developing, constructing or acquiring the housing project or by the administrator of the Federal Rent Supplement Program pursuant to Federal or State laws, rules or regulations.
'Federal Rent Supplement Program' means any plan, program, law, rule or regulation of the Federal Government under which the Federal Government pays to private individuals or nonpublic bodies owning a low rent housing project, all or any part of the rent of low income families or individuals eligible for public housing. (Initiative. Passed 11-2-71.)
1528.02 APPROVAL BY ELECTORS.
No low rent housing project shall be developed, constructed or acquired in any manner in the City by any public body or authority, nor shall approval be granted for participation in the Federal Rent Supplement Program, until a majority of the qualified electors of the City voting upon such issue, approve such project or such participation by voting in favor thereof at an election to be held for that purpose or at the next primary or general election. Such election shall be provided for by resolution of Council. (Initiative. Passed 11-2-71.)
1528.03 SEVERABILITY.
If any sentence, clause, section or part of this chapter is found to be unconstitutional, illegal or invalid, such unconstitutionality, illegality or invalidity shall affect only such clause, sentence, section or part of this chapter and shall not affect or impair any of the remaining provisions, sentences, clauses, sections or other parts of this chapter. It is hereby declared to be the intention of the electors that this chapter would have been adopted had such unconstitutional, illegal or invalid sentence, clause, section or part thereof not been included herein. (Initiative. Passed 11-2-71.)"

This conduct has allegedly worked to:

(a) perpetuate the present all-white character of the City;

(b) deny dwellings to prospective black residents of the excluded housing on account of race;

(c) deny dwellings to prospective white residents of such housing on account of the race of their black prospective fellow-residents; and

(d) interfere with the right of actual and prospective sponsors of federally assisted housing to assist persons in exercising their right to equal housing opportunity.

The Government seeks an order generally enjoining Parma and all its agents and officers from continuing to pursue its discriminatory housing practices and affirmative relief aimed at having the City undertake measures to correct the effects of its past unlawful conduct.

By memorandum opinion and order dated September 5, 1973, this Court denied Parma's motion to dismiss the Government's suit. It was ruled *inter alia* that a municipality is a "person" subject to suit under Section 3613 of the Fair Housing Act, and that the Government's complaint stated a claim for relief.

C 73–437 (hereinafter referred to as the Cornelius suit) was initially instituted by the Cleveland Chapter of the NAACP; the Housing Task Force; the Ozane Construction Company; five low and moderate income black plaintiffs presently residing in the Cleveland Metropolitan Area (but not Parma) who allege that they desire to reside in Parma but are prevented from doing so by the alleged racially discriminatory practices and policy of the City; and two white citizens of Parma charging that Parma's discriminatory policy deprives them of the social, economic, and professional benefits of an integrated community. The action seeks redress for alleged violations of rights secured by the Thirteenth and Fourteenth Amendments, the Civil Rights Act of 1866 (42 U.S.C. § 1981, § 1982), the Civil Rights Act of 1871 (42 U.S.C. § 1983), and the Fair Housing Act of 1968 (42 U.S.C. § 3601). Jurisdiction is predicated on 28 U.S.C. § 1343(3) and (4), 28 U.S.C. § 2201, and 42 U.S.C. § 3612. The named defendants are the City of Parma, its Mayor, its President of the City Council, and its Councilmen.

The complaint in *Cornelius* sets forth detailed allegations relative to the racial composition of defendant City and the circumstances surrounding Parma's blocking of the Forest City section 236 project. It is alleged, for example, that while Parma is the largest suburb in Cuyahoga County, having a population of approximately 100,216 residents, only .015% of the black population of the County, or fifty persons, reside in the City.

A fair reading of the complaint indicates that its basic thrust is directed against Parma's adoption and implementation of the ordinances previously discussed in regard to the Government's suit. It is alleged that the City's conduct, in enacting and implementing these ordinances, was aimed at setting up barriers to exclude low and moderate income blacks and other minorities from living in the City. The ordinances are said to have the further effect of maintaining the virtually all-white character and image of Parma, depriving white residents of Parma of the benefits of an integrated community, discouraging prospective builders and sponsors of low-income housing from building within the City of Parma, interfering generally with federally assisted housing programs, and excluding blacks and other minorities from equal access to jobs in the Parma area as well as equal access to educational opportunities. The plaintiffs in *Cornelius* seek as relief a declaration that the ordinances are void and of no effect, an injunction against Parma and its agents from engaging in further discriminatory housing practices and affirmative remedial action.

In a memorandum opinion and order dated September 18, 1973, the Court made the following rulings:

(1) The Cleveland Branch of the NAACP, the Ozane Construction Company, and the Housing Task Force lacked standing to sue.

(2) The action was untimely brought under 42 U.S.C. § 3612 of the Fair Housing Act, which expressly sets forth a 180 day limitations period.

(3) Insofar as plaintiffs' complaint sought relief under 42 U.S.C. § 1983 against the City of Parma, it was dismissed.

(4) The white individual plaintiffs lacked standing to sue under 42 U.S.C. § 1982.

(5) The black individual plaintiffs could maintain their suit as a class action pursuant to 23(b)(2) F.R.Civ.P.[2]

## II. PRESENT MOTIONS

Plaintiffs in *Cornelius* have filed several motions praying the Court to reconsider portions of its order of September 18, 1973. Plaintiffs seek reconsideration of: (a) the dismissal of plaintiffs' claim under the Fair Housing Act of 1968 and (b) the ruling that the white plaintiffs lack standing to sue. In addition, motion has been made pursuant to Rule 15 F.R.Civ.P. by the Cleveland Chapter of the NAACP to amend the complaint so that it may set forth allegations which it is contended would suffice to give it standing to sue.

By order dated November 9, 1973, the Court raised on its own motion whether plaintiffs, or any of them, in the *Cornelius* suit satisfy the threshold requirement imposed by Article III of the Constitution of alleging an actual case or controversy, and whether any or all the issues sought to be litigated by the Government in its suit are justiciable. In support of their respective positions, the parties submitted briefs, affidavits, and other supporting papers. Hearing was held on all questions pending before the Court on December 10, 1973.

## III. CORNELIUS SUIT

### A. Justiciability

The judicial power of federal courts is defined in Article III of the Constitution and is restricted to "cases" and "controversies." Giving expression to this case and controversy limitation is the doctrine of "justiciability," which is in itself no more than a "term of art" utilized by the courts to enforce the jurisdictional requirements of Article III. "Justiciability is . . . a concept of uncertain meaning and scope. Its reach is illustrated by the various grounds upon which questions sought to be adjudicated in federal courts have been held not to be justiciable. Thus, no justiciable controversy is presented when the parties seek adjudication of only a political question, when the parties are asking for an advisory opinion, when the question sought to be adjudicated has been mooted by subsequent developments, and when there is no standing to maintain the action." Flast v. Cohen, 392 U.S. 83, 95, 88 S.Ct. 1942, 1950, 20 L.Ed.2d 947 (1968).

In general, the doctrine of justiciability, in its various aspects, serves to assure that federal courts pass only on questions raised in actual controversies and which are appropriate for judicial determination.

Despite certain references in the *Cornelius* complaint to Parma's blocking of the section 236 project, it is unclear, as discussed more fully *infra,* whether these plaintiffs seek directly to challenge the building permit denial. Any such claim would in itself present substantial justiciability problems. See *infra.* But,

---

2. The class the named black plaintiffs represent has been defined as follows:

"All black citizens residing in the Greater Cleveland Metropolitan Area who are applicants or potential applicants for subsidized low and moderate income housing in the City of Parma, under the various programs enacted by the United States Congress or by the State of Ohio, who are being deprived by the actions or co-actions of the defendants of the right to reside therein."

there is no doubt that plaintiffs' major purpose in instituting this suit is to seek both declaratory and injunctive relief relative to the two ordinances at bar.

■■■■ A request for declaratory relief may be considered independently of whether other forms of relief are appropriate. Powell v. McCormick, 395 U.S. 486, 518, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969). The Federal Declaratory Judgment Act, 28 U.S.C. § 2201, however, while providing an additional remedy to litigants, does not add to, or expand, the jurisdiction of federal courts. Alabama State Federation of Labor v. McAdory, 325 U.S. 450, 461, 65 S.Ct. 1384, 89 L. Ed. 1725 (1944). An actual case or controversy is still required.[3] Skelly Oil Co. v. Phillips Petroleum Co., 339 U.S. 667, 671, 70 S.Ct. 876, 94 L.Ed. 1194 (1950); Aetna Life Ins. Co. v. Haworth, 300 U.S. 227, 240, 57 S.Ct. 461, 81 L.Ed. 617 (1937). Thus in United Public Workers of America v. Mitchell, 330 U.S. 75, 89, 67 S.Ct. 556, 564, 91 L.Ed. 754 (1947), it was stated: "For adjudication of constitutional issues, 'concrete legal issues, presented in actual cases, not abtractions' are requisite. This is as true of declaratory judgments as any other field." (Citations omitted.)

■■■■ In determining whether a declaratory judgment should issue, courts must distinguish between the real case or controversy and the abstract, hypothetical dispute. This is often a difficult and delicate task. "Basically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality . . . ." Maryland Casualty Co. v. Pacific Coal and Oil Co., 312 U.S. 270, 273, 61 S.Ct. 510, 512, 85 L.Ed. 826 (1941). In the actual im-

plementation of this test, the Supreme Court has continuously emphasized the substantial degree of concreteness required in declaratory judgment actions. See e. g., Laird v. Tatum, 408 U.S. 1, 92 S.Ct. 2318, 33 L.Ed.2d 154 (1972); Poe v. Ullman, 367 U.S. 497, 81 S.Ct. 1752, 6 L.Ed.2d 989 (1961); Communist Party of United States v. Subversive Activities Control Board, 367 U.S. 1, 81 S.Ct. 1357, 6 L.Ed.2d 625 (1960); See generally McCahill v. Borough of Fox Chapel, 438 F.2d 213, 215–217 (3d Cir. 1971).

With the above principles in mind, the Court will pass on each of the claims arguably contained in the *Cornelius* complaint in order to determine whether, with regard to any or all of the plaintiffs, such claims meet the tests of justiciability.

### 1. Black Plaintiffs

Plaintiffs' complaint as noted previously sets forth a number of factual allegations relative to Parma's denial of a building permit for construction by Forest City Enterprises of a section 236 project. The standing of future residents of proposed subsidized or public housing projects has been recognized in numerous cases where such persons have joined with developers or sponsors in concrete challenges to exclusionary actions of governmental authorities. *See e. g.* Park View Heights Corp. v. City of Black Jack, 467 F.2d 1208 (8th Cir. 1972); Sisters of Prov. of St. Mary of Woods v. City of Evanston, 335 F.Supp. 396 (N.D.Ill.1971); Crow v. Brown, 332 F.Supp. 382 (N.D.Ga.1971), aff'd., 457 F.2d 788 (5th Cir. 1972); Dailey v. City of Lawton, 296 F.Supp. 266 (W.D.Okl. 1969), aff'd., 10 Cir., 425 F.2d 1037; Kennedy Park Homes Assoc. v. City of Lackawanna, 318 F.Supp. 669 (W.D.N. Y.1970), aff'd., 436 F.2d 108 (2d Cir. 1970), cert. denied, 401 U.S. 1010, 91 S. Ct. 1256, 28 L.Ed.2d 546 (1971).

---

**3.** The language of 28 U.S.C. § 2201 is significant:

"In a case of *actual* controversy within its jurisdiction . . . any court of the United States, upon the filing of an ap-

propriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." (Emphasis added.)

In each of the above-cited cases, however, the blocked developments were still viable; the builders and sponsors by bringing suit affirmatively indicated their continuing interest in pursuing their projects to completion. Standing was accordingly granted to future residents as it was clear that live and real controversies existed regarding the projects sought to be built, and future tenants of the blocked developments had clear personal stakes in the outcome of the suits.

Here it is undisputed that Forest City Enterprises has abandoned its proposed project and is not itself contesting Parma's conduct relative to the project.[4] Although it can be said that the future residents of this project may have been injured by Parma's activity, no live controversy presently exists regarding this housing. Indeed, plaintiffs accept this reality, for as shown by their complaint none of them have alleged that they were themselves prospective tenants of the Forest City development. Nor do they seek to represent a class so limited.[5]

In any event, the basic thrust of plaintiffs' complaint is admittedly directed at the validity of the two Parma ordinances passed by initiative vote in November, 1971. Whether this challenge is being made in the context of a justiciable controversy is the pertinent issue for consideration.

It is undisputed that the challenged ordinances are simply "on the books"; they have not as yet been applied to any proposed federally subsidized housing project arguably within their ambit. Plaintiffs argue, however, that the passage and implementation of the ordinances directly and immediately injures them. The Court is unable to perceive how this is so.

The ordinance setting forth the thirty-five foot height limitation is on its face entirely neutral, applicable both to housing designed for rich and poor, and by its own force alone does not prevent plaintiffs from residing in Parma. Moreover, no allegation has been advanced that defendants, in reliance on this ordinance, have prohibited the construction of a low-income project with the intent and result of preventing plaintiffs, or any of the class they represent, from residing in the City. See e. g., Sisters of Prov. of St. Mary of Woods v. City of Evanston, supra. Nor has it been alleged that Parma has enacted the requirement to serve or operate as a barrier specifically designed to

---

4. In an affidavit dated November 19, 1973, by Mr. Nathan Shafron, Executive Vice-President of Forest City Enterprises, it was explained that even though Forest City Enterprises, at the time its building permit application was denied, had already expended Fifty Thousand Dollars in preparatory work, it deliberately decided not to pursue any rights it may have had to build the project. This decision was based on what it considered to be the intensity of citizen opposition to the project and the likelihood that expensive and time-consuming litigation would be necessary to establish its right to build the project (Shafron Aff. ¶ 8, 9.)

At approximately the same time it made the decision, however, Forest City Enterprises requested the Federal Housing Administration, which had preliminarily approved the construction of the section 236 project in Parma, to grant it permission to build a virtually identical ten-story hi-rise development in Parma Heights on a site only a few hundred feet west of the original

site in Parma. This request was granted, the requisite municipal approval was obtained, and the project was completed in October, 1973 (Shafron Aff. ¶ 10.)

Upon receiving approval from the F.H.A. to build in Parma Heights, Forest City Enterprises gave F.H.A. officials assurance that it would not build on the original site in Parma for a period of two years in order to allow the Federal Government to bring any suit it felt was appropriate, and absorb the economic loss that would result from holding the land in an undeveloped stage. (Shafron Aff. ¶ 11.)

Recently, however, Forest City Enterprises made the business judgment to honor its commitment until no later than February or March of this year and is presently developing plans and submitting proposals to the proper authorities in Parma to develop the site for commercial purposes. (Shafron Aff. ¶ 13.)

5. See note 2 supra.

block an actual project from going forward. *See e. g.*, Park View Heights v. City of Black Jack, *supra*. The most that can be drawn from plaintiffs' complaint is that the ordinance was enacted at approximately the same time that Forest City Enterprises' building permit application was denied. But it is nonetheless clear that this ordinance was never applied to that now defunct project.

To be sure, the ordinance setting forth the referendum requirement does on its face purport to subject any development of low-income public housing or any participation by any housing development in the Federal Rent Supplement Program to public approval before such development or participation may go forward. By its own force, this ordinance places special burdens on the construction of housing in defendant City for which many of the named black plaintiffs at bar would be eligible. Yet here too the Court is being asked to render an essentially advisory opinion as to the validity of this ordinance absent circumstances where it is being applied or even threatened to be applied.

Plaintiffs argue that the mere existance of this ordinance operates to "chill" or deter builders from coming forward with proposals for housing suitable to their needs. In support of this conten-

tion, counsel have submitted a number of affidavits from private developers in the Cleveland Metropolitan Area which indicate that it is their policy to refrain from attempting to build subsidized housing in communities where their projects would be submitted to voter approval.[6]

Many of these affidavits, however, are predicated on the belief that Parma would apply this ordinance to private subsidized projects for moderate income residents such as, for example, those financed pursuant to section 236 of the National Housing Act, 12 U.S.C. § 1715z–1. The Court's reading of the ordinance is that it would not apply to section 236 developments except insofar as any such project seeks to participate in the Federal Rent Supplement Program, 12 U.S.C. § 1701s.[7] The uncertainty, however, as to what sorts of projects Parma would apply the ordinance serves only to underscore the hypothetical and contingent nature of the suit at bar.

With regard to the ordinance's effect on the construction of public housing within Parma, it is undisputed that the City has not as yet entered into any local cooperation agreement with the Cuyahoga Metropolitan Housing Authority in accordance with 42 U.S.C. § 1415(7)(a) and (b).[8] As a consequence, no public housing may as yet be built in

6. *See e. g.*, Aff. of George Clarke Martin (Dec. 5, 1973); Aff. of Alan Gressel (Dec. 3, 1973); Aff. of A. F. Orlean (Nov. 30, 1973).

7. This view is not based simply on a reading of Parma's Ordinance, but reflects also the Court's awareness that the referendum procedures of Article XXXIV of the California State Constitution, upon which Parma's Ordinance has been substantially patterned, have been construed by California's Attorney General not to be applicable to Sections 236, 235 and 221(d)(3) (National Housing Act, 12 U.S.C.A. §§ 1715z–1, 1715z and 1715*l*) type low rent housing projects acquired, developed or constructed by private persons or corporations and subsidized and insured by the Federal Government. See 54 Ops. Atty.Gen. 168 (1971).

8. 42 U.S.C. § 1415(7)(a) and (b) provides: (For a general discussion of this statute, *see*

Mahaley v. CMHA, supra, 355 F.Supp. at pp. 1247–1248.)
"In recognition that there should be local determination of the need for low-rent housing to meet needs not being adequately met by private enterprise—
(a) The Authority shall not make any contract with a public housing agency for preliminary loans (all of which shall be repaid out of any moneys which become available to such agency for the development of the projects involved) for surveys and planning in respect to any low-rent housing projects initiated after March 1, 1949, (i) unless the governing body of the locality involved has by resolution approved the application of the public housing agency for such preliminary loan; and (ii) unless the public housing agency has demonstrated to the satisfaction of the Authority that there is a need for such low-rent housing which is not being met by private enterprise; and

that community under the auspices of the CMHA. This refusal on the part of Parma and a number of other suburban communities to provide for public housing in the face of its clear need is currently under judicial scrutiny. Mahaley v. CMHA, 355 F.Supp. 1257 (N.D. Ohio 1973) (Appeal Pending). But at this stage in time, it is entirely conjectural as to what relationship the referendum requirement ordinance has relative to any decision by Parma or its officials to enter into such an agreement.[9] Therefore, it is again the case that even in the area of public housing, the ordinance's actual effect is at present uncertain.

Plaintiffs' reliance on a number of cases which permitted broad classes of low-income persons directly to challenge alleged governmental discriminatory practices in housing is misplaced. See e. g., Mahaley v. CMHA, supra; Banks v. Perk, 341 F.Supp. 1175 (N.D.Ohio 1972), aff'd in part, reversed in part, 473 F.2d 910 (6th Cir. 1973); James v. Valtierra, 313 F.Supp. 1 (N.D.Cal.1970), rev'd on other grounds, 402 U.S. 137, 91 S.Ct. 1331, 28 L.Ed.2d 678 (1971); Ranjel v. City of Lansing, 293 F.Supp. 301 (W.D.Mich.1969), rev'd on other grounds, 417 F.2d 321 (6th Cir. 1969),

cert. denied, 397 U.S. 980, 90 S.Ct. 1105, 25 L.Ed.2d 390 (1970); Gautreaux v. C.H.A., 265 F.Supp. 582 (N.D.Ill.1967). In all the above-cited cases, what was being challenged was governmental conduct which clearly and affirmatively affected the rights of plaintiffs bringing suit, and actual controversies were so presented to the courts that effective relief could be fashioned, if such was necessary. The courts did not have to speculate concerning the direct and immediate interests of the plaintiffs, as this was patently evident.

The circumstances involved in James v. Valtierra, supra, are instructive. There plaintiffs, citizens of San Jose and San Mateo Counties, California, were "'persons of low income,' who [had] been determined to be eligible for public housing, and who [had] been placed on the appropriate waiting lists." See 313 F.Supp. at 3. Principal defendants were the respective housing authorities of San Jose and San Mateo. Plaintiffs challenged the decision of these housing authorities not to request federal assistance with which to finance the construction of additional public housing units without prior approval by community vote as required by Article XXXIV of the California State Constitution.[10]

(b) The Authority shall not make any contract for loans (other than preliminary loans) or for annual contributions pursuant to this chapter with respect to any low-rent housing project initiated after March 1, 1949, (i) unless the governing body of the locality involved has entered into an agreement with the public housing agency providing for the local cooperation required by the Authority pursuant to this chapter. . . . ."

9. It would seem, however, that in passing the referendum requirement ordinance, the citizens of Parma were seeking to substitute their direct approval for the discretion of their public officials in regard to any decision to enter into a cooperation agreement.

10. The full text of Article XXXIV is as follows:
"Article XXXIV Public Housing Project Law
§ 1. Approval of electors; definitions
Section 1. No low rent housing project shall hereafter be developed, constructed, or ac-

quired in any manner by any state public body until, a majority of the qualified electors of the city, town or county, as the case may be, in which it is proposed to develop, construct, or acquire the same, voting upon such issue, approve such project by voting in favor thereof at an election to be held for that purpose, or at any general or special election.

For the purposes of this article the term 'low rent housing project' shall mean any development composed of urban or rural dwellings, apartments or other living accommodations for persons of low income, financed in whole or in part by the Federal Government or a state public body or to which the Federal Government or state public body extends assistance by supplying all or part of the labor, by guaranteeing the payment of liens, or otherwise. For the purposes of this article only there shall be excluded from the term 'low rent housing project' any such project where there shall be in existence on the effective date hereof, a contract for financial assistance between any state public

As relief, plaintiffs prayed the Court to declare Article XXXIV unconstitutional, and enjoin defendants from relying on it as a reason for not seeking federal financing. The dispute in *Valtierra* between plaintiffs and defendants, accordingly, was real and immediate. The putatively illegal policy of the housing authorities in deferring to the strictures of Article XXXIV had a direct and real effect on the immediate possibilities of the plaintiffs to have housing built which would be suitable to their needs, and the Court was in a position where it could fashion effective relief.

Mahaley v. CMHA, *supra,* is also worthy of close examination. There, actions were brought by classes of tenants and applicants for public housing in the Cleveland Metropolitan Area challenging *inter alia* the alleged unconstitutional acts of a number of suburban municipalities (including defendant City herein) in declining to enter into cooperation agreements with the Cuyahoga Metropolitan Housing Authority. Such agreements were necessary under the applicable law before any development of public housing in a particular locality could proceed.[11] The CMHA, a party to that suit, was shown to have taken sufficient affirmative steps to induce the defendant municipalities to allow public housing to be constructed within their boundaries. *Id.* 355 F.Supp. at 1261–1262. Under these circumstances, therefore, the *conduct of the municipalities* had a direct and immediate impact on plaintiffs bringing suit; and the Court was presented with a real and substantial controversy in which, again, effective relief could be fashioned.

 In the instant suit, however, the Court is not presented with like circumstances. The challenged conduct of Parma in enacting the ordinances has not as yet directly and immediately injured plaintiffs. No actual conflict has yet arisen between the rights of the low and moderate income plaintiffs and the actions of the defendants relative to these ordinances. Indicative of the presence of abstract injury only is the fact that if the Court were to entertain this suit and on the merits declare the suspect ordinances invalid, this judicial action would not serve as the catalyst for the construction of the housing undeniably needed by plaintiffs. Public authorities and private sponsors would still be needed to come forward.

Accordingly, it must be held that challenge to the Parma ordinances is not being made in the context of a real and substantial controversy of sufficient immediacy or concreteness to warrant adjudication. Golden v. Zwickler, 394 U.S. 103, 109, 89 S.Ct. 956, 22 L.Ed.2d 113 (1969). As the Supreme Court stated in Thorpe v. Housing Authority, 393 U.S. 268, 284, 89 S.Ct. 518, 527, 21 L.Ed.2d 474 (1969):

> "We do not sit . . . 'to decide abstract, hypothetical or contingent questions . . . or to decide any constitutional question in advance of the necessity for its decision. . . .' Alabama State Federation of Labor v. McAdory, 325 U.S. 450, 461, 65 S.Ct. 1384, 1389, 89 L.Ed. 1725."

### 2. NAACP

The NAACP, in moving to further amend plaintiffs' complaint pursuant to Rule 15, F.R.Civ.P., seeks to cure the defects in pleading previously found by the Court in its order of September 18, 1973.[12] It seeks now to allege in sub-

---

body and the Federal Government in respect to such project.

For the purposes of this article only 'persons of law income' shall mean persons or families who lack the amount of income which is necessary (as determined by the state public body developing, constructing, or acquiring the housing project) to enable them, without financial assistance, to live in decent, safe and sanitary dwellings, without overcrowding."

11. See note 8 *supra.*

12. There it was found that the NAACP had alleged only a broad general interest in the question presented by the suit. No allegations had been made that the NAACP, or any of its membership, was actively and con-

stance that the conduct of defendants here being challenged has a direct and personal adverse effect on its low and moderate income members and on the Chapter itself in representing their interests.

For the reasons stated in the preceding section, even if leave to amend were granted, this plaintiff would not present the Court with a justiciable controversy. Therefore, this motion is denied.

### 3. White Plaintiffs

The two white plaintiffs in the *Cornelius* suit allege that they are at present residents of Parma who, due to the alleged discriminatory housing practices of their municipality, have been "denied the social, economic, and professional benefits of an integrated community and are embarrassed or otherwise suffer, being stigmatized in the white ghetto of Parma." It is averred that Parma's conduct constitutes injury to rights secured to them by the Fair Housing Act of 1968, 42 U.S.C. § 3601 et seq., and the Civil Rights Act of 1866, 42 U.S.C. § 1982. In support of their contention that they have standing to maintain this action, plaintiffs rely on the Supreme Court's recent decision in Trafficante v. Metropolitan Life Ins. Co., 409 U.S. 205, 93 S.Ct. 364, 34 L.Ed.2d 415 (1972).

*Trafficante* involved an action brought by two tenants (one white and one black) of a large apartment complex in San Francisco. The tenants alleged that their apartment owners had engaged in numerous discriminatory housing practices, and that as a result of these practices they had been denied the various benefits of interracial associations, suffering much the same injuries as are alleged by the white plaintiffs herein. They sought relief both under

cretely engaged in specific projects for the development of low income or other federally subsidized housing within the City of Parma. Nor were any allegations advanced that the NAACP or any of its members had been specifically aggrieved by the conduct of Parma.

42 U.S.C. § 1982 and 42 U.S.C. § 3610 of the Fair Housing Act of 1968.

The Supreme Court considered only the tenants' rights under 42 U.S.C. § 3610. It held that the tenants fall within the scope of "persons aggrieved" contained therein and, accordingly, could maintain an action pursuant to that statute.

The Court noted that the definition of "persons aggrieved" in 42 U.S.C. § 3610(a) was broad,[13] *Id.* at 208, 93 S.Ct. 364. And that the injury alleged by the tenants was not insubstantial. *Id.* at 209, 93 S.Ct. 364. Further, it was observed that the important purposes of the Fair Housing Act would only be frustrated by rigid standing requirements. As "complaints by private persons are the primary method of obtaining compliance with the Act," such standing requirements should be construed as broadly as is permitted by Article III of the United States Constitution. *Id.* at 209, 93 S.Ct. at 366. The importance of "private attorney general" suits in effectuating modern legislative programs was also underscored. It was observed that such suits would in particular "[serve] an important role in this part of the Civil Rights Act of 1968 in protecting not only those against whom a discrimination is directed but also those whose complaint is that the manners of managing a housing project affects 'the very quality of their daily lives.' " *Id.* at 211, 93 S.Ct. at 368. The Court concluded:

"We can give vitality to § 810(a) [42 U.S.C. § 3610(a)] only by a generous construction which gives standing to sue to all in the same housing unit who are injured by racial discrimination in the management of those facil-

13. Section 3610(a) provides in pertinent part: "Any person who claims to have been injured by a discriminatory housing practice or who believes that he will be irrevocably injured by a discriminatory housing practice that is about to occur (hereafter 'person aggrieved') may file a complaint with the Secretary."

ities within the coverage of [the statute]." *Id.* at 212, 93 S.Ct. at 368.

This Court, in its memorandum opinion and order of September 5, 1973, dealing with the Government's suit recognized that municipalities may be subject to suit under the Fair Housing Act. *See also* Park View Heights Corp. v. City of Black Jack, *supra,* 467 F.2d 1208 (8th Cir. 1972); Kennedy Park Homes Assoc. v. City of Lackawanna, *supra,* 436 F.2d 108 (2d Cir. 1970), cert. denied, 401 U.S. 1010, 91 S.Ct. 1256, 28 L. Ed.2d 546 (1971); United States v. City of Black Jack, P.H.E.O.H.Rptr. Para. 13,561 (E.D.Mo.1972); Sisters of Prov. of St. Mary of Woods v. City of Evanston, *supra,* 335 F.Supp. 396 (N.D.Ill. 1971). Therefore, it would seem that in light of *Trafficante* a white tenant of a project owned by a municipality would have standing to challenge racial discrimination in the management of those facilities amounting to violations of the applicable provisions of the Fair Housing Act.

The issue presented by these plaintiffs, however, is broader. They submit that their legal right to interracial association, as recognized by *Trafficante,* extends so far as to enable them to challenge the alleged racial exclusionary activities of the city wherein they reside.

There are clear indications in *Trafficante* that the standing of persons to vindicate rights to interracial association is limited to circumstances where suit is brought against the management of their own housing facilities. The precise holding in that case was to accord standing "to *all in the same housing unit* who are injured by racial discrimination in the management of those facilities . . ." *Id.* 409 U.S. at 211, 93 S.Ct. at 368 (emphasis added.) Yet it must be observed that the housing complex under consideration in *Trafficante* was comprised of 8,200 residents

and was, therefore, larger than many towns in this country. *Id.* at 206, 93 S. Ct. 364. Moreover, less than 1% of the tenants in the complex were black. *Id.* at 208 fn. 5, 93 S.Ct. 364. Accordingly, it would not be an unreasonable extension of *Trafficante,* and well within its spirit, to rule that white residents of a city like Parma, whose population barely exceeds 100,000, and whose black population is well below 1%, could challenge, under the Fair Housing Act, any purported racially exclusionary activity pursued by the City.

Assuming *arguendo* that *Trafficante* may be read to cover the activities of cities like Parma, the Court must still decide whether these plaintiffs set forth timely and justiciable causes of action either under the Fair Housing Act or 42 U.S.C. § 1982. It is concluded that they do not.

Plaintiffs' challenge to the two ordinances does not present the Court with a justiciable controversy under either statute. As was previously noted with regard to the black plaintiffs, these ordinances have not as yet been applied, or ever threatened to be applied. In consequence, they have not operated in any concrete sense to injure any rights arguably secured to the white plaintiffs.

Again, as with the black plaintiffs, it is unclear whether the *Cornelius* complaint squarely challenges Parma's denial of a building permit to the Forest City project. The white plaintiffs do not allege that they were even residents of Parma at the time this project was blocked.[14] Clearly, however, if they were Parma residents at that time, it could well be contended that the blocking of this project, destined for integrated occupancy, injured their newly framed *Trafficante* rights to interracial associations.

█ Yet, plaintiffs' action under the Fair Housing Act is bottomed on 42 U.

14. Plaintiffs Robert Cain and Reverend Kenneth Coy are merely defined in the *Cornelius* amended complaint as: "white citizens of the United States and residents of Parma, Ohio." They seek to represent a class defined as follows: "All white citizens residing in Parma who are deprived of economic, social, and professional relations with minorities and who are being injured by being stigmatized in a white ghetto."

S.C. § 3612. This section provides in pertinent part:'

> "The rights granted by Sections 3603, 3604, 3605, and 3606 of this title may be enforced by civil actions in appropriate United States district courts without regard to the amount ·in controversy. . . . A civil action shall be commenced within one hundred and eighty days after the alleged discriminatory housing practice occurred."

The Court notes that plaintiffs did not institute their action until April 27, 1973, and the denial of the building permit for the Forest City project occurred and ended in November, 1971. Plaintiffs' action under the Fair Housing Act, therefore, to the extent it seeks judicial review of this denial, is untimely. It was filed more than one hundred eighty days after this alleged discriminatory housing practice took place. *See* James v. Hafler, 320 F.Supp. 397 (N.D. Ga.1970), aff'd., 457 F.2d 511 (5th Cir. 1972); Brown ,v. Ballas, 331 F.Supp. 1033 (W.D.Tex.1971). *Cf.* Goodman v. City Products Corp., 425 F.2d 702 (6th Cir. 1970).

■ Nor do the white plaintiffs at bar have standing under section 1982 to challenge the denial of the building permit.[15] Their legal interests to interracial associations, while cognizable under the Fair Housing Act do not fall "arguably within the zone of interests to be protected" by section 1982. *Cf.* Sierra Club v. Morton, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972).

In Jones v. Alfred H. Mayer Co., 392 U.S. 409, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968), section 1982 was substantially revitalized. There it was held that the statute barred all racial discrimination in the sale or rental of property and, thus construed, was a valid exercise of congressional power under the Thirteenth. Amendment. As was observed, however, by the Ninth Circuit Court of Appeals in its treatment of *Trafficante* at 446 F.2d 1158, 1163:

> "[There is] nothing in Jones v. Alfred H. Mayer to indicate that Section 1982 would be construed to grant standing to sue to anyone other than a person who was the victim of racial discrimination in the sale or rental of property."

It was said, in addition:

> "The Court's examination of the legislative history of the Civil Rights Act of 1866 in Jones v. Alfred· H. Mayer, *supra*, makes it clear that the purpose of Congress was to forbid racial discrimination affecting the basic civil rights enumerated therein, including the right to purchase or lease property, and to guarantee the newly freed slaves the property rights enjoyed by white citizens. . . . We find no indication that Congress intended to allow either third-party enforcement of the rights granted by Section 1982, or an independent right of action in a person who has not been stamped with a 'badge of slavery' either by an act of discrimination or some racially motivated interference with his property rights."

While a number of cases decided subsequent to *Jones* have accorded standing to white plaintiffs under Section 1982, *See e. g.*, Sullivan v. Little Hunting Park, Inc., 396 U.S. 229, 90 S.Ct. 400, 24 L.Ed.2d 386 (1969); Williamson v. Hampton Mgmt. Co., 339 F.Supp. 1146 (N.D.Ill.1972); Walker v. Pointer, 304 F.Supp. 56 (N.D.Tex.1969), none may be read as supporting the proposition that white citizens who are not directly affected by black racial discrimination in the enjoyment of their property rights, may sue under that statute. In *Sullivan,* the white plaintiff had been expelled from a community recreation club because in the course of renting property, he had assigned club membership rights to a black person. In *Walker* the

15. 42 U.S.C. § 1982 provides: "All citizens of the United States shall have the same right, in every State or Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property."

white plaintiffs had been evicted from their apartment because they had entertained black guests there. In *Williamson* the white plaintiff's right to sublet her apartment was interfered with on racial grounds. All of the white plaintiffs in these cases had themselves been "direct victims of black racial discrimination, discrimination directed at them because of their black associations." Walker v. Pointer, *supra,* at 58.

It is true that the Supreme Court's decision in *Trafficante* does not resolve the question of standing under section 1982 to vindicate rights to interracial associations. That issue was not reached. *Id.* 409 U.S. at 209 fn. 8, 93 S.Ct. at 368. The concurring opinion of Mr. Justice White, however, joined by Justices Blackmun and Powell, is revealing. There it was observed:

"Absent the Civil Rights Act of 1968, I would have great difficulty in concluding that petitioner's complaint in this case presented a case or controversy within the jurisdiction of the District Court under Art. III of the Constitution."

Significantly, this Court's reading of section 1982 is buttressed by more recent comments of the Supreme Court clarifying the true nature of its holding in *Trafficante.* In both Linda R. S. v. Richard D., 410 U.S. 614, 617 n. 3, 93 S. Ct. 1146, 35 L.Ed.2d 536 (1973) and O'Shea v. Littleton, 414 U.S. 488, 94 S. Ct. 669, 38 L.Ed.2d 674 (1974), 42 U.S. L.W. 4139, 4141 n. 2, the Court noted in dealing with the justiciability problems there involved: "Congress may enact statutes creating legal rights, the invasion of which creates standing *even though no injury would exist without the statute. See e. g.,* Trafficante v. Metropolitan Life Ins. Co., 409 U.S. 205, 212, 93 S.Ct. 364, 34 L.Ed.2d 415 (1972) (White, J. concurring) ; Hardin v. Kentucky Utilities Co., 390 U.S. 1, 6, 88 S. Ct. 651, 19 L.Ed.2d 787 (1968)." (Emphasis added.) This statement is con-

tained in the majority opinion of both the above-cited cases. It may only be read as an indication that whatever right there is to redress injury to interracial associations arises solely from the Fair Housing Act; and that the rights secured by section 1982, accordingly, are not co-extensive, in this regard, with those conferred by the 1968 Act.

The purposes of the Fair Housing Act and section 1982 are, to be sure, substantially parallel. Both were generally designed to prohibit discrimination in housing. But section 1982 does differ markedly from the 1968 Act both in purpose and scope. There are "vast differences between, on the one hand, a general statute applicable only to racial discrimination in the rental and sale of property and enforceable only by private parties acting on their own initiative and, on the other hand, a detailed housing law, applicable to a broad range of discriminatory practices and enforceable by a complete arsenal of federal authority." Jones v. Alfred H. Mayer Co., *supra,* 392 U.S. at 417, 88 S.Ct. at 2191. The Fair Housing Act is a comprehensive legislative effort designed to remedy a pressing social need. As recognized in *Trafficante,* Congress intended, by its broad definition of "persons aggrieved" in the Fair Housing Act, to enable all persons to redress injury to the right to interracial association. Regretfully, this newly created right may not be read into section 1982, the Fair Housing Act's Nineteenth Century counterpart.

Accordingly, the Court reaffirms its holding, made in the memorandum opinion and order of September 18, 1973, that the white plaintiffs lack standing under 42 U.S.C. § 1982 to litigate their rights to interracial associations.[16]

## IV. GOVERNMENT SUIT

The Attorney General has instituted suit under the Fair Housing Act of 1968, 42 U.S.C. § 3601 et seq., seeking to challenge Parma's alleged wholesale dep-

16. All private plaintiffs may appear as *amicus curiae* in the Government suit.

rivation of rights under the Act.[17] One of the City's acts which the Government suit seeks to review is the denial of the building permit to Forest City Enterprises.

Defendant Parma, in arguing that the United States lacks standing to challenge this permit denial states:

"It would be a scandal of major proportions for the Attorney General, in the name of the United States of America, to expend taxpayers' money in an attempt to vindicate any alleged claims on behalf of a highly successful builder and promoter."

This argument is more shrill than persuasive and merits but little discussion. ■ The Attorney General's suit is jurisdictionally based on 42 U.S.C. § 3613. This section provides:

"Whenever the Attorney General has reasonable cause to believe that any person or group of persons is engaged in a pattern or practice of resistance to the full enjoyment of any of the rights granted by this subchapter, or that any group of persons has been denied any of the rights granted by this subchapter and such denial raises an issue of general public importance, he may bring a civil action in any appropriate United States district court. . . ."

Actions brought pursuant to this section should not seek simply to redress the private interests of any particular citizen or business entity, although this of course may be partially what is at stake. Nor should suit be brought to challenge isolated, accidental, or peculiar discriminatory acts or conduct. *See* United States v. Pelzer Realty Co., 484 F.2d 438 (5th Cir. 1973); United States v.

Peachtree Tenth Corp., 437 F.2d 221 (5th Cir. 1971). Rather, the larger purpose is to enable the Attorney General, in his official capacity as chief law enforcement officer of the United States, to protect the interest of the United States in seeing that its laws are enforced. United States v. Northside Realty Associates, 324 F.Supp. 287, 292 (N.D.Ga.1971), remanded on other grounds, 474 F.2d 1164 (5th Cir. 1973); United States v. Leubke, 345 F.Supp. 179, 181 (D.C.Colo.1972).

■ Parma's denial of the building permit affects the rights and interests of many others besides the particular developer or promoter. It manifestly had a pronounced effect on those who would have been residents of the project if it had been allowed to go forward. Since it can be said that this act constitutes a denial of rights under the Fair Housing Act to a group of persons, the matter is properly raised for adjudication under 42 U.S.C. § 3613.[18]

■ The Government also seeks to directly challenge the passage and implementation of the two Parma ordinances as part of its pattern or practice action. But, as was discussed previously, these ordinances may not be said to have operated in any real sense to deny or make unavailable dwellings on the basis of race. See 42 U.S.C. § 3604(a). Nor have they as yet interfered with sponsors of federally assisted housing who seek to aid persons in exercising their right to equal housing opportunities. See 42 U.S.C. § 3617.

Accordingly, the Attorney General does not have standing to raise the validity of these ordinances within the ambit of his pattern or practice suit.[19]

---

17. In addition, the United States bases its cause of action on the Thirteenth and Fourteenth Amendments.

18. The initial determination of whether a denial of rights raises a question of public importance is left to the discretion of the Attorney General. United States v. Northside Realty Assoc., Inc., 474 F.2d 1164, 1168 (5th Cir. 1973); United States v. Bob Lawrence Realty, Inc., 474 F.2d 115 (5th

Cir. 1973), cert. denied, 414 U.S. 826, 94 S. Ct. 131, 38 L.Ed.2d 59 (1973).

19. As noted previously, the United States complains that the ordinances violate the Thirteenth and Fourteenth Amendments. Case authority recognizes that the United States has an implied civil cause of action to seek the removal of impediments to interstate commerce. It is reasoned that such an action is inherently within the national pow-

However, should the remaining allegations be proven and if affirmative relief is granted, it may be necessary in fashioning appropriate relief for the Court to deal with these ordinances. *See e. g.*, Gautreaux v. City of Chicago, 480 F.2d 210 (7th Cir. 1973).

## CONCLUSION AND ORDER

Accordingly, it is hereby ordered:

(1) That plaintiffs' amended complaint in the *Cornelius* suit be dismissed;

(2) That plaintiff NAACP's motion to amend the *Cornelius* complaint is denied; and

(3) That the Government's complaint, insofar as it seeks to directly challenge the two Ordinances, is dismissed.

It is so ordered.

er to regulate commerce. *See e. g.*, In re Debs, 158 U.S. 564, 15 S.Ct. 900, 39 L.Ed. 1092 (1895) ; United States v. City of Jackson, Mississippi, 318 F.2d 1 (5th Cir. 1963) ; United States v. Brand Jewelers, Inc., 318 F.Supp. 1293 (S.D.N.Y.1970). Judge Frankel in *Brand Jewelers*, in addition to recognizing an action under the commerce clause held in the alternative that the Fourteenth Amendment also provided an implicit cause of action to the United States to seek redress for "widespread" due process deprivations. Here, however, the existence of the ordinances do not afford standing to the Attorney General with respect to any implied cause of action arguably present under either amendment. As yet, there has been no deprivation of private rights.