UNITED STATES of America, Plaintiff,

v.

CITY OF PARMA, Defendant.

No. C73–439.

United States District Court,
N. D. Ohio, E. D.

Dec. 4, 1980.

See also, D.C., 494 F.Supp. 1049.

Robert R. Soltis, Andrew Boyko, Parma, Ohio, for defendant.

Avery Friedman, Cleveland, Ohio, amicus curiae.

Robert J. Reinstein, Brian F. Heffernan, Michael L. Barrett, Theodore M. Shaw, Civil Rights Div., U. S. Dept. of Justice, Washington, D. C., for plaintiff.

## REMEDIAL ORDER

BATTISTI, Chief Judge.

The United States of America instituted this civil rights action on April 27, 1973, alleging that the City of Parma, Ohio was engaging in practices violative of the Fair Housing Act, Title VIII of the Civil Rights Act of 1968, 42 U.S.C. § 3601 et seq.

A trial on the issue of liability in this action was held between the period of November 7, 1979 and December 14, 1979, at which twenty witnesses testified and the depositions of eleven witnesses and over 250 exhibits were admitted into evidence. The issue of remedy was pretermitted for a subsequent proceeding if liability were found.

On June 5, 1980, this Court issued a Memorandum Opinion, 494 F.Supp. 1049, finding the City of Parma liable for violations of Sections 804(a) and 817 of the Fair Housing Act. The Court specifically found that the actions of Parma which were challenged by the government, namely, the rejection of a fair housing resolution, the consistent refusal to sign a cooperation agreement with the Cuyahoga Metropolitan Housing Authority, the adamant and longstanding opposition to any form of public or low-income housing, the denial of a building permit for the Parmatown Woods low-income housing development, the passage of a 35 foot residential height restriction ordinance, the passage of an ordinance requiring voter approval for low-income housing, and the refusal to submit an adequate housing assistance plan in its Community Development Block Grant application, individually and collectively, were motivated by a racially discriminatory and exclusionary intent and had foreseeable segregative effects. In sum, the Court found that Parma, the largest suburb of Cleveland, has had and continues to follow a long-standing policy and practice of excluding black persons from residing in Parma in any substantial numbers.

The Court ordered the parties in this action to consult with one another in an effort to agree upon the terms of a remedy that will so far as possible eliminate the effects of Parma's past discriminatory practices and ensure future compliance with the Fair Housing Act. On August 4, 1980, the parties met and were unable to reach agreement on the terms of a remedial order to be entered as a final judgment in this litigation. Subsequently, at the request of the United States, the Court scheduled an evidentiary hearing on the remedy in this action.

On September 24–26, 1980, a hearing was held in this Court at which both parties presented witnesses and documentary testimony concerning a possible remedy for this litigation. At the conclusion of that hearing, the Court ordered the parties to submit final recommendations concerning a remedial order.

Pursuant to the Court Order requesting remedial recommendations, the government submitted a proposed remedial order, a brief in support of the proposed remedy with a study and recommendations prepared by Paul Davidoff, Executive Director of the Metropolitan Action Institute in New York who testified as an expert witness at the September hearings a proposed order appointing a Special Master, and a final proposed remedial order. The City of Parma submitted a brief (1) in opposition to this Court's jurisdiction over a remedy and (2) in opposition to the government's proposed remedial order. Pursuant to recent Sixth Circuit decisions,[1] the jurisdiction of this Court is not in question. In addition, Parma submitted objections to the proposed appointment of a Special Master. Parma never submitted a remedial proposal to the Court. Not only were Parma's submissions not helpful to the Court,[2] but the briefs filed by Parma quoted inapposite cases and employed racially incendiary language. Such a use of documents within the public record could be expected to, and in fact did, reach the press.[3] The Court has admonished the defendant's present lawyers, both in chambers and from the bench, not to traumatize and incite those who may be affected by the delicate and necessary steps that the Court must take to remediate the statutory violations which were found in Parma.

The Court has reviewed the recommendations and remedy submissions of the parties and the record of the remedy proceeding held herein. Based on this review, the Court has formulated a comprehensive remedial plan to be implemented in this action.

## I.

As in any equity proceeding, the scope of the remedy is determined by the nature and the scope of the legal violation. *Swann v. Charlotte-Mecklenburg Board of Education*, 402 U.S. 1, 16, 91 S.Ct. 1267, 1276, 28 L.Ed.2d 554 (1971). Accordingly, the remedy in this case must address this Court's overall findings that Parma has had a long-standing policy of deliberate racial exclusion, in addition to addressing the specific unlawful actions which Parma took in furtherance of this exclusionary design.

■ Section 813 of the Fair Housing Act, 42 U.S.C. § 3613, pursuant to which the United States brought this lawsuit, provides in pertinent part that, in cases of this kind, the Attorney General may request "such preventive relief, including an application for a permanent or temporary injunction, restraining order or other order against the person or persons responsible" for the violation of the rights guaranteed by the Act. This section requires the Court to exercise its powers to fashion affirmative equitable relief designed to eliminate, to the extent possible, the discriminatory effects of Parma's actions. See *Park View Heights v. City of Black Jack*, 605 F.2d 1033 (8th Cir.

---

1. On September 15, 1980, the Sixth Circuit denied Parma's application for an emergency stay of the remedial proceedings in this Court, and on September 30, 1980, the Sixth Circuit dismissed Parma's appeal on the issue of liability as untimely pending the issuance of this Court's remedial orders.

2. Parma did introduce testimony at the hearings concerning the possible rehabilitation and use of the Westview Apartment Complex for low-income housing. The witness who testified on this matter, Mr. Ernest R. Kubasek, is the Chief Housing Inspector of the City of Parma.

   Parma Mayor John Petruska testified that Westview and the adjoining area of Knollwood are "not up to what I would consider proper housing for the people in the way of parking facilities, safety facilities. It's a high crime area. It's probably the worst area of our community." (Tr. pp. 294–95).

   Without addressing here Parma's desire to house low-income people in a high crime area, the worst area of their community, the Court does not consider this proposal to be particularly helpful (1) because of its limited scope in terms of the liabilities found and (2) because no one empowered to effect the rehabilitation and conversion to low income use was presented at trial. In the comprehensive remedy which is required in this case, the potential desirability and feasibility of the use of any particular property is better left to the Fair Housing Committee, discussed below.

3. *See*, for example, *The Plain Dealer*, Thursday, October 16, 1980, at p. 4–B, quoting Parma's brief filed October 14, 1980.

1979). Courts should not be grudging with respect to the entry and scope of injunctive relief under a statute where Congress expressly authorized it. *Hodgson v. First Federal Savings and Loan Association of Broward County, Florida,* 455 F.2d 818 (5th Cir. 1972) (age discrimination in employment); *United States v. Hayes International Corp.,* 415 F.2d 1038 (5th Cir. 1969) (employment).

■ This Court has already recognized its duty to grant relief in this action which will so far as possible eliminate the discriminatory effects of Parma's past actions and ensure Parma's future compliance with the Fair Housing Act. *Louisiana v. United States,* 380 U.S. 145, 154, 85 S.Ct. 817, 822, 13 L.Ed.2d 709 (1965); *Park View Heights v. City of Black Jack, supra; United States v. West Peachtree Tenth Corp.,* 437 F.2d 221, 228 (5th Cir. 1971). In determining appropriate equitable relief to eliminate such discriminatory effects, courts must be guided by the provisions and purposes of the Fair Housing Act. *Metropolitan Housing Development Corp. v. Village of Arlington Heights,* 616 F.2d 1006 at 1011 (7th Cir. 1980); *Park View Heights v. City of Black Jack, supra,* at 1036; Cf. *Teamsters v. United States,* 431 U.S. 324, 364, 97 S.Ct. 1843, 1869, 52 L.Ed.2d 396 (Title VII); *Albermarle Paper Co. v. Moody,* 422 U.S. 405, 417, 95 S.Ct. 2362, 2371, 45 L.Ed.2d 280 (Title VII).

■ The purpose of the Fair Housing Act is to provide, within constitutional limitations, for fair housing throughout the United States, 42 U.S.C. § 3601. The primary objective of Title VIII is, in the words of then Senator Mondale, to replace "the ghetto[s] . . . by truly integrated and balanced living patterns." 114 Cong.Rec. 3422 (1968). This objective is one to which Congress has accorded the highest priority, *Trafficante v. Metropolitan Life Insurance Co.,* 409 U.S. 205, 211, 93 S.Ct. 364, 367, 34 L.Ed.2d 415 (1972); *Park View Heights v. City of Black Jack, supra.* The Act is to be construed generously so as to ensure the prompt and effective elimination of all traces of discrimination within the housing field. *Traf-*ficante, supra, at 211–212, 93 S.Ct. at 367–368. *Gladstone Realtors v. Village of Bellwood,* 441 U.S. 91, 99 S.Ct. 1601, 60 L.Ed.2d 66 (1979); *Marr v. Rife,* 503 F.2d 735, 740 (6th Cir. 1974).

■ At the same time, however, this Court should not order relief that is more intrusive on the governmental functions of Parma than is necessary to achieve Title VIII's goals. *Park View Heights v. City of Black Jack, supra* at 1040; *Resident Advisory Board v. Rizzo,* 564 F.2d 126, 149 (3rd Cir. 1977); *cert. denied,* 435 U.S. 908, 98 S.Ct. 1457, 55 L.Ed.2d 499 (1978).

■ For civil rights violations such as those in existence herein, courts are governed by traditional principles of equity in fashioning affirmative relief. *Milliken v. Bradley,* 433 U.S. 267, 279–80, 97 S.Ct. 2749, 2756–57, 53 L.Ed.2d 745 (1976); *Teamsters v. United States,* 431 U.S. 324, 374–375, 97 S.Ct. 1843, 1874, 52 L.Ed.2d 396 (1976); *Swann v. Charlotte-Mecklenburg Board of Education,* 402 U.S. 1, 12–13, 91 S.Ct. 1267, 1274, 28 L.Ed.2d 554 (1970). As Chief Justice Burger stated in *Lemon v. Kurtzman,* 411 U.S. 192, 200, 93 S.Ct. 1463, 1469, 36 L.Ed.2d 151 (1972):

> (E)quitable remedies are a special blend of what is necessary, what is fair, and what is workable. 'Traditionally, equity has been characterized by a practical flexibility in shaping its remedies and by a facility for adjusting and reconciling public and private needs.' *Brown v. Board of Education,* 349 U.S. 294, 300, 75 S.Ct. 753, 756, 99 L.Ed. 1083 (1955).

With these principles in mind, many courts have addressed findings of liability against municipalities for violations of the Fair Housing Act and have authorized broad remedies aimed at effectively curing these violations. *United States v. City of Black Jack,* 508 F.2d 1179 (8th Cir. 1974), *cert. denied,* 422 U.S. 1042, 95 S.Ct. 2656, 45 L.Ed.2d 694 (1975); *Kennedy Park Homes Assn. v. City of Lackawanna,* 436 F.2d 108 (2d Cir. 1970), *cert. denied,* 401 U.S. 1010, 91 S.Ct. 1256, 28 L.Ed.2d 546 (1971); *Metropolitan Housing Development Corporation v.*

*Village of Arlington Heights,* 616 F.2d 1006 (7th Cir. 1980). *See Garrett v. City of Hamtramck,* 503 F.2d 1236 (6th Cir. 1974); *Parkview Heights v. City of Black Jack, supra.*

In fashioning the relief granted herein, this Court has also been guided by the above-stated principles. The remedial plan set forth below is fair, is workable and is, above all, necessary. However, the Court is mindful that only with the strong and sincere efforts of Parma in carrying out the terms of this Order will Parma become an open community. This Remedial Order will provide freedom and flexibility to Parma to shape, within certain guidelines, its own means for achieving and maintaining equal housing opportunity and to demonstrate its support for the affirmative fair housing policies and programs contained therein. However, the Court will supervise closely the actions taken by Parma to redress its past discriminatory activities and the resulting injury to blacks and other persons in the Cleveland metropolitan area.

## II.

### REMEDY

A. *General Non-Discrimination Provisions*

■ This Court has found that Parma, with racially discriminatory intent and effect, has violated Sections 804(a) and 817 of the Fair Housing Act. Parma must, therefore, be enjoined permanently from further action which would violate the Act. In civil rights cases such as this, once a finding of liability has been made, such injunctions are routinely granted. *United States v. West Peachtree Tenth Corp.,* 437 F.2d 221 (5th Cir. 1971) *reh. denied,* 437 F.2d 231 (5th Cir. 1971); *United States v. Warwick Mobile Homes, Inc.,* 537 F.2d 1148 (4th Cir. 1976).

Accordingly, it is hereby ORDERED that the defendant City of Parma, its officers, directors, agents, servants, employees, successors and all persons in active concert or participation with any of them, are hereby permanently enjoined from:

1. Engaging in any conduct having the purpose or effect of perpetuating or promoting racial residential segregation or of denying or abridging the right of any person to equal housing opportunity on account of race, color, religion, sex or national origin;

2. Discriminating against any person or group of persons on account of race, color, religion, sex or national origin in connection with the planning, development, construction, acquisition, financing, operation or approval of any low-income or public housing units;

3. Interfering with any person in the exercise of his right to secure equal housing opportunity for himself or for others; and

4. Taking any action which in any way denies or makes unavailable housing to persons on the basis of race, color, religion, sex or national origin.

B. *Educational Program*

■ This Court has found that Parma, through its City officials, has violated the Fair Housing Act. In order that all Parma officials and employees understand and carry out their responsibilities under the Fair Housing Act and the terms of this Order, Parma should develop and implement a fair housing educational program for those persons. *See United States v. West Peachtree Tenth Corp. supra.* This program should be open to any other interested persons or groups and may be designed with the assistance of a fair housing group experienced in such an endeavor. It would serve to dispel the notion, on the part of City employees, that Parma City leaders are fostering racially discriminatory policies. *See Arnold v. Ray,* No. C73–478 (N.D. Ohio, decided December 11, 1979), slip op. at 4–5 (Lambros, J.).

Therefore, it is ORDERED that a fair housing educational program shall be developed and and implemented for all Parma officials and employees responsible for carrying out the terms of this Order. The purpose of this program shall be to inform such persons of Parma's nondiscriminatory housing policy and of their obligations un-

der the terms of this Order and the Fair Housing Act. In addition, the program shall consist of instruction concerning components of an affirmative action plan designed to inform black and other minority persons that they are welcome to reside in Parma. Attendance at this program shall be mandatory for the officials and employees involved.

### C. *Fair Housing Resolution*

This Court has found that Parma's refusal to enact a fair housing resolution was racially motivated and had a segregative effect. To remedy this violation, and to ameliorate Parma's reputation as a racially exclusionary community, Parma is ORDERED to enact a fair housing resolution welcoming persons of all races, creeds and colors to reside in Parma and setting forth Parma's policy of nondiscrimination in all aspects of housing in the City.[4]

### D. *Advertisement of Parma As An Open Community*

This Court has found that Parma has perpetuated a racially exclusionary and discriminatory image. In order to eliminate the perception of Parma in the Cleveland area, and in the minority community of Cleveland in particular, as a closed municipality, Parma must implement an advertising program promoting Parma as an equal housing opportunity community. The purposes of this program are clear: to inform the region that (1) Parma is seeking to become an open community; (2) Parma is attempting to expand housing choice for minorities in the City; (3) all persons are welcome in Parma; and (4) discriminatory

practices which have characterized Parma in the past no longer reflect the attitude of the City and its citizens.

Accordingly, it is further ORDERED that Parma shall undertake a comprehensive advertising program in newspapers which circulate principally in the black community in the region, as well as in the major regional newspapers. This advertising campaign shall be directed at accomplishing the above-stated purposes in addition to promoting Parma as a good place for persons of all races to reside.

It is further ORDERED that Parma print, duplicate or otherwise make two hundred (200) clear and legible copies of this Remedial Order and one hundred (100) clear and legible copies of this Court's Memorandum Opinion of June 4, 1980, immediately. The Remedial Order and Memorandum Opinion shall be made freely available to anyone, upon request, at Parma's City Hall. It shall be within the discretion of the Special Master to require Parma to produce additional copies of these materials as he deems it necessary. Parma shall give notice within its advertising campaign that these materials are available, free of charge, at Parma's City Hall.

### E. *Parma's Ordinances*

This Court's June 5, 1980, decision in this action found certain of the Codified Ordinances of Parma to be violative of the Fair Housing Act. Specifically, the Height Limitation Ordinance (§ 1529.37) and the Low Income Housing Ordinance (§ 1528) were found to be discriminatorily motivated and to have a racially discriminatory effect, and the Parking Ordinance (§ 1197.03) and the

---

4. The specific wording of such a resolution should, of course, be left for Parma to formulate. In this regard, the Court takes notice of the testimony of Paul Davidoff, the government's expert witness at the remedy proceeding, who testified concerning further action which Parma could take in connection with the fair housing resolution.

Specifically, Mr. Davidoff recommended that Parma enact a fair housing ordinance and develop a statement of criteria for judging its own progress in working constantly to expand housing opportunity. (Tr. p. 38) This Court believes firmly that the cause of equal housing opportunity in Parma would be greatly served by the establishment in Parma, in conjunction with the passage of a fair housing resolution, of a fair housing enforcement mechanism to handle housing discrimination complaints in the City. Such a mechanism, which may be eligible for federal funding, would reduce reliance on federal enforcement of fair housing and strengthen local commitment to open occupancy. The Court suggests that Parma gives serious consideration to such a procedure.

Zoning Referendum Ordinance (§ 1229.01) were found to have a racially segregative effect with no sufficient countervailing legitimate interests behind their passage.

As stated above, this Court has broad equitable powers to remedy violations of the Fair Housing Act and, where ordinances such as the ones at issue have been found to thwart equal housing opportunity, such ordinances must give way to the dictates of federal policy. *See, e. g., United States v. City of Black Jack, supra; Metropolitan Housing Development Corp. v. Village of Arlington Heights, supra.* However, this Court must also be mindful of its duty to limit intrusion into Parma's affairs to the extent consistent with equal housing opportunity, *Park View Heights v. City of Black Jack, supra; Resident Advisory Board v. Rizzo, supra,* and should not interfere with the enforcement of Parma's ordinances except where their implementation would have a racially segregative purpose or effect.[5]

■ Parma's Low Income Housing Ordinance can affect only proposed low-income housing in Parma and, as this Court has noted in its June 5, 1980, opinion in this action, its presence in Parma's Codified Ordinances serves as a deterrent to the development of low-income housing. The continued existence of this discriminatorily-motivated ordinance in a virtually all-white city like Parma can only help to maintain segregation while serving no other legitimate interest of Parma. Accordingly, it is hereby ORDERED that Parma's Low Income Housing Ordinance be of no further force and effect in that City.

The Height Limitation Ordinance, the Parking Ordinance and the Zoning Referendum Ordinance are not limited to low or moderate income housing. It is ORDERED that those ordinances may remain in full force and effect subject to the following exceptions:

(1) the Height Limitation Ordinance shall not apply to any low or moderate income housing proposal submitted to the City;

(2) the Parking Ordinance shall not apply to any low or moderate income housing proposal submitted to the City, except that the City may impose a parking requirement, reasonable in light of the purposes and goals of this Order, on any such submission, subject to the approval of the Fair Housing Committee established pursuant to this Order;

(3) the Zoning Referendum Ordinance shall not apply to any proposed change in land use where any low or moderate income housing project is proposed for such land.[6]

### F. *Bringing Low Income Housing to Parma*

■ This Court has found that Parma's adamant and long-standing opposition to any form of public or low-income housing was motivated by a racially discriminatory intent and had a racially discriminatory effect. To remedy the continuing effects of this conduct, Parma must be required to take actions aimed at increasing the supply of low-income housing for the purpose of increasing housing opportunities for low-income blacks and other minorities in the

---

**5.** Thus, Section 815 of the Fair Housing Act provides that "any law of a State, a political subdivision, or other jurisdiction that purports *to require or permit any action that would be a* discriminatory housing practice under this title shall to that extent be invalid." 42 U.S.C. § 3615.

**6.** Conditions 1–3, *supra,* are consistent with this Court's duty to avoid unreasonable intrusion into Parma's affairs while at the same time safeguarding the rights of those protected by the Fair Housing Act. It is a reasonable provi-

sion, as testified to by Parma's expert witness, Harry Henshaw. (Tr. pp. 364, 369) This provision does not imply that, with regard to the Parking and Zoning Referendum ordinances, Parma should not be allowed to impose reasonable parking and zoning requirements on residential development in the City. Where allegedly reasonable requirements clash with the development of low or moderate income housing, Parma's Fair Housing Committee (*see infra*) should decide on the reasonableness of such requirements in light of the purposes and goals of this Order.

City.[7] There are several actions which, collectively, can accomplish this.

### 1. *Fair Housing Committee*

Parma is hereby ORDERED to establish a Fair Housing Committee within its City government. The purposes of this Committee are to operate as the primary governmental agency in Parma responsible for developing a remedial plan consistent with this Order, to ensure that the provisions of this Order are fully complied with and that fair and open housing practices become a reality there. The specific functions of this Committee shall be as follows:

(a) Developing the advertising and educational programs referred to above;

(b) Drafting a fair housing resolution;[8]

(c) Developing an outreach program aimed at (i) enlisting the support of the real estate and development community in the region for the cause of making Parma a truly open community and (ii) establishing ties with regional fair housing and minority groups in order that their efforts may also be directed at making fair housing a reality in Parma;

(d) Establishing within the City government a Housing Information and Referral Service which would among other things assist persons wishing to move into Parma by providing information concerning housing opportunities and available facilities, providing housing counseling services, and acting as a referral agency to various social service facilities and agencies;

(e) Developing a program designed to foster an interest among housing developers in bringing low-income housing to Parma. This program shall include advertising for proposals for low and moderate income housing when federal funds for such housing have been made available, conducting educational meetings for developers concerning low-income housing programs and Parma's interest in having such housing in the City, and developing a series of developer incentives aimed at making the development of low-income housing in Parma attractive;[9] and

(f) Conducting a survey of vacant land in Parma (City-owned or otherwise) suitable for low-income housing development. Such a survey would assist in the development of a Housing Assistance Plan for Parma in connection with an application for Community Development Block Grant funds (*see infra*).[10]

Membership on the Fair Housing Committee shall consist of Parma citizens who are collectively knowledgeable in the fields of fair housing, real estate, housing development, planning and federal housing programs and other citizens who are sincerely interested in working to promote the purposes of this Order. Within 30 days of the entry of this Order, Parma shall submit to the Court for its approval the names of the persons who will serve on the Fair Housing Committee. The United States shall then have 30 days to respond to Parma's recommendations.

During the course of the Fair Housing Committee's formulation of the detailed components of the remedial plan in this action, it shall meet on a regular basis with an Evaluation Committee composed of representatives of fair housing, minority, religious and business groups in the region. This Evaluation Committee shall review the work of the Fair Housing Committee and, where appropriate, make recommendations to the Court, or its representative. Within

---

**7.** By low and moderate income housing is meant housing which is affordable by those households earning 80% or less of the median income for the Cleveland metropolitan area.

**8.** In addition, if the Committee heeds this Court's suggestion, formulating a fair housing enforcement program for the City.

**9.** Such incentives could include, among other things, density bonuses, promise of reasonable variances, cost write-downs on City-owned land and easing of the bureaucratic process.

**10.** The Committee may also consider proposing that Parma should not conduct City business with any real estate or development concern which has not signed an assurance of nondiscrimination in the conduct of its business.

30 days of the entry of this Order, the parties shall each submit to the Special Master recommendations concerning membership on the Evaluation Committee. The Court shall appoint the members of the Evaluation Committee. Neither committee shall have fewer than 7 nor more than 15 members.

All decisions of the Fair Housing Committee shall be reviewed within 10 days first by the Evaluation Committee and then by the Special Master for approval. In the event that either Committee is dissatisfied with the decision which is reached by the Special Master, that Committee may appeal directly to the Court for review.

### 2. Public Housing

In addition to finding discriminatorily motivated opposition by Parma to any type of low-income housing, this Court found that Parma refused to sign a cooperation agreement with CMHA for racial reasons.

Accordingly, Parma is hereby ORDERED to take whatever action is necessary in order to allow the construction of public housing in the City. This shall be done in one of two ways:

(a) Parma shall sign a Cooperation Agreement with CMHA; or

(b) Parma shall establish its own Housing Authority and proceed to develop a public housing program in the City.[11]

If method (b) is chosen, Parma's Housing Authority shall not impose a City residency requirement on public housing occupancy and shall, unless impossible, fill at least 20% of its public housing vacancies from the applicants on the CMHA public housing waiting list. With regard to the selection of applicants from the CMHA list, the Parma Housing Authority shall follow the same priority established by CMHA.

### 3. Section 8 Housing

Parma is hereby ORDERED to develop a program in the City aimed at the interjurisdictional use of the Section 8 existing housing program. This shall be done in one of two ways:

(a) Parma shall develop a cooperative relationship with CMHA, the current administrator of the Section 8 existing program in Cuyahoga County; or

(b) Parma shall designate or establish a Public Housing Agency within its government for the purpose of applying for funds to implement a Section 8 existing housing program and carrying out that program.[12] In the event that Parma chooses this option, no Parma residency requirement may be imposed, and Parma may not impede in any way the ability of those persons holding Section 8 certificates issued through CMHA to find housing in Parma. Because of the many intricacies of the Section 8 existing program, Parma might consider seeking the cooperation of a fair housing group within or without the Cuyahoga County area, knowledgeable in the workings of Section 8, in the development of its own interjurisdictional program.

### 4. Community Development Block Grant Funds

This Court has found that Parma's refusal to submit an adequate CDBG application in 1975 was racially motivated and had a discriminatory effect. The receipt of CDBG funds would have helped the City of Parma to provide an equal opportunity in housing for all races. This opportunity has not been lost. As credible evidence presented by the government in the remedy proceeding indicates, CDBG funds can help cover expenses related to the remedy ordered herein. In addition to facilitating equal housing opportunities, CDBG allocations can provide a major funding source for other municipal projects in Parma which, by its own claim, is financially distressed.

---

**11.** To the extent permitted by Ohio law. Nothing in this paragraph is intended to preclude Parma from exploring other nondiscriminatory public housing options which may involve different construction/management methods than are normally utilized.

**12.** To the extent permitted by Ohio law.

As an entitlement community under the CDBG program, Parma has reserved for its use, to increase low and moderate income housing opportunities and make other needed improvements in Parma nearly one million dollars each year in federal funds. Because Parma has claimed to this Court that it is in serious financial difficulty, and in consideration of the Court's previous findings of liability based in part upon Parma's motives for refusing to participate in the CDBG program, a court ordered remedy imposing a requirement that Parma apply for its allocated CDBG funds is appropriate.

Accordingly, it is hereby ORDERED that Parma shall take all steps necessary for the submission of a Community Development Block Grant application acceptable to HUD which will enable Parma to avail itself of these federal funds which are of utmost importance to the implementation of the provisions of this Order.

### 5. New Development of Low-Income Housing

There are no federally-subsidized low-income housing projects in Parma. That this has occurred is not fortuitous, as Parma has adamantly opposed any form of low-income housing because of the fear that it might attract blacks to the City. In light of this, Parma is ORDERED to develop plans for low or moderate income residential development, over a period of several years, of land (City-owned or otherwise) suitable for the development of such housing.[13] Plans must be made for either entirely low and moderate income housing development or mixed income housing development on these sites. After these plans are formulated, Parma must then make all efforts possible to assure that this new housing is constructed.

At the remedy proceeding in this action, the United States presented the testimony of an economist from the Columbus, Ohio Area Office of HUD, who testified concerning Parma's low-income housing needs and the methodology routinely employed by HUD to calculate these needs and the low-income housing needs of municipalities throughout Ohio and the nation. The Court finds this testimony credible and accepts HUD's determination that Parma's low-income housing needs currently approximate 2669 households. (Tr. p. 272) Given this need, Parma is ORDERED to make all efforts necessary to ensure that at least 133 units of low and moderate income housing are provided annually in Parma.[14] This number is a threshold beyond which Parma must strive to go in providing new housing opportunities in the City. This is so because, in addition to addressing its current needs, Parma must address those low-income housing needs which have been in existence since at least 1968 but which have been ignored by Parma for racial reasons. This Court can require no less in carrying out its obligations in this action.

While the ultimate burden of producing low or moderate income housing in Parma may indeed lie with the housing development community, Parma must facilitate in every way the construction of this housing and speed up the progress of any such proposals through Parma's bureaucratic mechanisms. With this type of cooperation between Parma and the development industry, new low or moderate income housing will become a reality in this City.

### III.

### SPECIAL MASTER

Parma has raised objections to the appointment of a Special Master under

---

**13.** To the extent that land is suitable for such development with the exception of the land's zoning classification, and the Fair Housing Committee determines that a change in that zoning to a classification which would allow low or moderate income housing development would be reasonable, the existing classification shall be changed to a classification enabling construction of low or moderate income housing.

**14.** This number is derived from Parma's total need of 2669 households. Had Parma applied for CDBG funds and submitted a Housing Assistance Plan to HUD setting forth this need, HUD would expect Parma to attempt to meet, by way of new construction, 15% of its needs over a 3 year period. This breaks down to approximately 5% per year, which is 133 units. (Tr. pp. 285–86)

Federal Rule of Civil Procedure 53(b) and the Supreme Court decision in *LaBuy v. Howes Leather Company*, 352 U.S. 249, 77 S.Ct. 309, 1 L.Ed.2d 290 (1957), which the Court will address.[15] Federal Rule of Civil Procedure 53 does not delineate the parameters of a court's authority. By reciting some of the functions of a Special Master, Rule 53 does not preclude others[16] so long as the Court does not abdicate its decision-making responsibility. Liability against Parma has been established. *LaBuy v. Howes Leather Company, supra,* is manifestly inapposite.

As Parma has indicated, "[t]here is no ... body of law promulgated by the Supreme Court in actions under the 'Fair Housing Act' as there has been in [school desegregation cases]." (Defendant City of Parma's Objections to Proposed Appointment of "Special Master," filed October 14, 1980, p. 1.)[17] However, the magnitude of Parma's liability has necessitated a remedy which addresses the numerous illegal actions by the Defendant City. The magnitude of the wrong has dictated the magnitude of the remedy, which is, necessarily, broader than remedies in prior housing cases which involved a single discriminatory ordinance and/or the development of a single low-income housing project. See *Kennedy Park Homes Ass'n v. City of Lackawanna, N. Y.*, 436 F.2d 108, (2nd Cir. 1970), *cert. denied,* 401 U.S. 1010, 91 S.Ct. 1256, 28 L.Ed.2d 546 (1971); (development of a low-income housing project on a certain location in the city); *Metropolitan Housing Development Corp. v. Village of Arlington Heights,* 616 F.2d 1006 (7th Cir. 1980) (development of a low-income housing project, new site agreed upon in consent decree); *Park View Heights v. City of Black Jack,* 605 F.2d 1033 (8th Cir. 1979) (discriminatory zoning ordinance led to the demise of a racially integrated town house development); *Resident Advisory Board v. Rizzo,* 564 F.2d 126 (3rd Cir. 1977), *cert. denied,* 435 U.S. 908, 98 S.Ct. 1457, 55 L.Ed.2d 499 (1978) (failure of the defendants to permit the construction of planned low-income housing project).

The provisions set out at II above form a comprehensive framework within which a plan can be developed to remedy the violations for which Parma has been found liable. Because of the broad scope of the legal violations in this action, the remedy is of necessity also broad. However, no matter how broad and complicated the resolution to this litigation may be, it is essential that it go forward in an orderly fashion. To see that this occurs, and that the provisions of this Order are ultimately carried out, the Court is of the opinion that the appointment of a Special Master is clearly necessary.

One of a myriad of examples which illustrate the need for a Special Master in public law litigation of this kind should suffice: the Court would be required to meet with,

---

**15.** The Court has considered the balance of Parma's objections and finds them to be without merit.

**16.** In a thoughtful study of the use of Special Masters written under a contract with the Federal Judicial Center, Vincent M. Nathan, Professor of Law at the University of Toledo, distinguished the pre-decretal master from the post-decretal. "While the propriety of the appointment of a master prior to the issuance of a remedial decree should be measured by [the Rule 53] test, the same is not true of a post-decretal appointment under which a master's tasks will relate to monitoring and possibly to implementation of the court's order." (footnote omitted) Nathan, Vincent M., "The Use of Masters in Institutional Reform Litigation," *A Report to the Federal Judicial Center,* reprinted from the Toledo Law Review, Vol. 10, Winter 1979, at 432.

The propriety of a post-decretal appointment, however, should rest in the sound discretion of the trial court, and its decision to make such an appointment should be subjected only to an "abuse of discretion" standard on appeal. So long as the remedial phase of the litigation is sufficiently complex and comprehensive to suggest that the court's reliance upon the parties themselves is not calculated to produce ascertainable compliance in relatively short order, the court's decision to refer the matter to a master should not be disturbed. *Id.* at 432–33.

**17.** This Court sees no reason to wait five years before determining that a Special Master is needed in order to adhere to the limited precedent available in fair housing cases. *See Chicago Housing Authority v. Austin,* 511 F.2d 82 (7th Cir.1975); *Gautreaux v. Chicago Housing Authority,* 384 F.Supp. 37 (N.D.Ill.1974).

preside over and enter into dialog with all the various political and Court-ordered entities in the political forums which this remedy requires. In public law litigation, these tasks are more appropriately delegated to a Special Master. The Court has given careful consideration to the appointment of a Magistrate as Special Master in this case. However, a Magistrate suffers from the same disabilities as does the Court; therefore, the Court finds that a Magistrate would be inappropriate as a Special Master here.

The powers and functions of the Special Master shall be as follows:

1. The Special Master shall oversee the formulation, by the Fair Housing and Evaluation Committees, of the remedial procedures to carry out the provisions of this Order. He shall evaluate the sufficiency as well as the practicability of these procedures in light of the purposes which they are intended to serve;

2. The Special Master shall be available, during the formulation process, on a regular basis, to give advice to and to serve as an arbitrator of possible disputes between the parties and/or Committees. All questions which the parties and/or Committees may have concerning this Order and their duties thereunder shall be directed first to the Special Master. Questions which cannot be resolved by the Special Master may be addressed directly to the Court;

3. The Special Master shall prepare and submit to the Court recommendations concerning the remedial plan prepared pursuant to this Order, together with any revisions or alternative plans which he deems necessary to carry out the Court's mandate in this action;

4. The Special Master may conduct such hearings and investigations as he deems necessary to the performance of his duties;

5. The Special Master may utilize the services, when necessary, of experts in various fields in performing his duties under this Order. The Special Master and such experts shall have complete and unrestricted access to the records of defendant City of Parma. They shall have free access to all Parma employees and staff. They shall be given notice of and free access to all meetings, public or private, at which this Order and the remedial plan to be formulated hereunder are to be discussed. The Special Master shall determine the time and place of all meetings except those regularly scheduled governmental meetings whose time and place have been established by State law, local ordinance, or long-standing custom or tradition. Meetings set by the Special Master shall have precedence over all other business of the City. The Special Master shall preside over those parts of every meeting he attends which are, in his judgment, related to these Remedial Orders. The Special Master may bring official reporters to record and then to transcribe the minutes of said meetings, executive or otherwise. Records of executive sessions shall be held in confidence by the Special Master, his advisers, and the reporters, unless otherwise ordered by the Court. It is the intention of the Court that the Special Master's access to private meetings shall be interpreted broadly to include, for example, executive sessions and councilmanic caucuses;

6. With the consent of the attorneys for both parties, the Special Master may, as the need arises, contact and confer with the attorneys for the respective parties. If counsel for one party does not so consent, the Special Master may order a meeting with both parties;

7. The Special Master shall oversee the implementation of the ultimate remedial plan for this litigation and report to the Court, on a regular basis, concerning Parma's progress under this Order. Such report may contain recommendations, if necessary, concerning action to be taken by Parma to improve compliance with the remedial plan.

The Special Master shall be compensated at a fair and reasonable rate commensurate with his or her abilities and duties. The rate of compensation shall be set by the Court. Parma is responsible for the compensation of the Special Master.

Having considered the appointment of a Special Master in light of the functions which that person must perform, the Court

hereby appoints Joseph W. Bartunek as Special Master in this case.

## IV.

## CONCLUSION

The ultimate responsibility for the success of the remedial plan in this litigation lies with the City of Parma. The procedures and mechanisms put in place in response to this Order are designed to work, and work well, toward providing equal housing opportunity, but only with the good faith cooperation of Parma can that goal be achieved. The Court reminds those who are to carry out the policies implicit in these Orders that the right of all people to open housing was drawn from the Constitution and incorporated into the laws of the United States through the efforts of the Congress and the Executive for implementation by the United States Courts, pursuant to their powers under Article III of the Constitution. Thus the defendant City of Parma must dedicate itself to carrying out the spirit as well as the letter of this remedy. Only with such dedication to the principles of the fair housing policies as promulgated by the United States Congress will Parma become, and be viewed as, a truly open community.

This Court retains jurisdiction of this action for all purposes.