**UNITED STATES of America, Plaintiff-Appellee,**

v.

**CITY OF PARMA, OHIO, Defendant-Appellant.**

No. 81-3031.

United States Court of Appeals, Sixth Circuit.

Argued June 16, 1981.

Decided Oct. 14, 1981.

Rehearing and Rehearing En Banc Denied Dec. 10, 1981.

---

Robert R. Soltis, Andrew Boyko, Sol., Parma, Ohio, for defendant-appellant.

Michael L. Barrett, Brian Heffernan, Theodore M. Shaw, Miriam R. Eisenstein, Walter W. Barnett, James P. Turner, Dept. of Justice, Civ. Rights Div., Washington, D. C., for plaintiff-appellee.

Before LIVELY, KEITH and MERRITT, Circuit Judges.

LIVELY, Circuit Judge.

This is an appeal from the final decision of the district court in an action under the Fair Housing Act of 1968, Pub.L. 90–284, Title VIII, § 801 *et seq.*, 42 U.S.C. § 3601 *et seq.* (Title VIII or the Act). The district court found that the City of Parma had engaged in a number of acts which had the purpose and effect of maintaining Parma as a segregated community in violation of the Act. A broad remedial order was entered.

## I.

### A.

The Attorney General filed the present action in the United States District Court for the Northern District of Ohio on April 27, 1973 seeking to enjoin Parma from violating the Act.[1] Such an action by the Attorney General is authorized by § 813 of the Act, 42 U.S.C. § 3613[2] if the conditions of that section are met. Parma filed a counterclaim in which it requested that a three-judge court be convened; this request was denied. Thereafter the defendant filed a motion for summary judgment, which was denied by the district court in an order which identified three material issues of fact in dispute:

1. Whether Parma's virtually all-white character occurred adventitiously as a result of unrestricted free choice in the market place as defendant contends or whether it resulted from deliberate discrimination which was caused or perpetuated by defendant's conduct;

2. Whether successive decisions by defendant City of Parma or by and through its officials which resulted in the exclusion of various types of federally subsidized and potentially integrated housing had the purpose or effect of making housing unavailable to persons because of race; and

3. Whether Forest City's proposal to construct Parmatown Woods was rejected solely on nondiscriminatory grounds, as Parma contends, or was treated less favorably than other proposals, wholly or partially because of the actual or anticipated race of some of the prospective residents.

*United States v. City of Parma,* 471 F.Supp. 453, 454–55 (N.D.Ohio 1979).

### B.

Following a trial on the issue of liability the district court concluded that the record established Parma's violation of the Act in a series of actions which had both the purpose and effect of maintaining Parma as a virtually all-white community. *United States v. City of Parma, Ohio,* 494 F.Supp. 1049 (N.D.Ohio 1980). The court made two initial findings:

An extreme condition of racial segregation exists in the Cleveland metropolitan area.

*Id.* at 1055; and

The proposition that the Cleveland metropolitan area and Parma became racially segregated solely as a result of associational preferences and economics, and not because of racial discrimination, is refuted overwhelmingly by the evidence in this case.

*Id.* at 1057. The court then made nine findings on the causes of the "dual housing market" which is found to exist in the Cleveland metropolitan area. In addition to private activities such as discriminatory

---

1. Initially, the case was consolidated with a suit filed under the Act by several individuals and the NAACP. The complaint of the individuals and the NAACP was subsequently dismissed for lack of standing, absence of a justiciable controversy and untimeliness. *Cornelius v. City of Parma,* 374 F.Supp. 730 (N.D.Ohio), *vacated and remanded,* 506 F.2d 1400 (6th Cir. 1974), *vacated and remanded,* 422 U.S. 1052, 95 S.Ct. 2673, 45 L.Ed.2d 705, *remanded for dismissal,* 521 F.2d 1401 (6th Cir. 1975), *cert. denied,* 424 U.S. 955, 96 S.Ct. 1430, 47 L.Ed.2d 360 (1976).

2. § 3613. Enforcement by the Attorney General; issues of general public importance; civil action; Federal jurisdiction; complaint; preventive relief

(a) Whenever the Attorney General has reasonable cause to believe that any person or group of persons is engaged in a pattern or practice of resistance to the full enjoyment of any of the rights granted by this subchapter, or that any group of persons has been denied any of the rights granted by this subchapter and such denial raises an issue of general public importance, he may bring a civil action in any appropriate United States district court by filing with it a complaint setting forth the facts and requesting such preventive relief, including an application for a permanent or temporary injunction, restraining order, or other order against the person or persons responsible for such pattern or practice or denial of rights, as he deems necessary to insure the full enjoyment of the rights granted by this subchapter.

acts of real estate dealers, "red lining" by lenders and insurers and refusals to list or sell by private owners, the court found that policies of the Federal Housing Administration and the Veterans Administration, particularly with respect to restrictive covenants, and site and tenant selection practices of the Cuyahoga Metropolitan Housing Authority (CMHA) had contributed to and maintained a black ghetto on the east side of Cleveland. *Id.* at 1057–59.

Parma, the largest suburb of Cleveland, lies west of the Cuyahoga River. According to the 1970 census, Parma had a population of 100,216 of whom 50 were black. The same census disclosed that metropolitan Cleveland had a population of 2,064,194 of whom 332,614 were black. Thus while the metropolitan area had a black population of 16%, Parma's was a small fraction of one per cent. The largest concentration of black residents was in the east side of the City of Cleveland and in a few eastern suburbs. The district court rejected Parma's two explanations for the segregated condition of the Cleveland area—associational preference and economic factors. In doing so, the court considered expert testimony from both parties and concluded that the experts produced by the government supported their conclusions better than those who testified for the City. *Id.* at 1059–65.

The district court then considered the evidence which the government had introduced to prove that Parma had followed racially exclusionary policies and practices. This evidence included testimony that Parma had a reputation and image of being the Cleveland suburb most hostile to blacks and statements of elected officials of Parma which were either overtly racist or were found to have racist meanings. These findings were cited as the backdrop against which the government challenged five specific actions or series of actions in this lawsuit:

A) Parma's refusal to enact a fair housing resolution welcoming "all persons of goodwill";

B) Parma's general opposition to all forms of public and low-income housing;

C) Parma's denial of building permits for a privately-sponsored low-income housing development—Parmatown Woods;

D) Parma's enactment and application of four land use ordinances which impose height, parking and voter approval limitations on housing developments; and

E) Parma's refusal to submit an adequate housing assistance plan in connection with its application for Community Development Block Grant Funds.

*Id.* at 1066. Each of these actions of the defendant was then discussed at length.

The district court concluded that the rejection by the Parma City Council of a "weak resolution" of welcome in the face of intense local opposition was a symbol of the official attitude and "sent out the message that black people of goodwill were not welcome." *Id.* at 1068. In reaching this conclusion the court rejected the mayor's testimony that he opposed the resolution only because it was superfluous in view of state law which provided for fair housing.

The district court reviewed the history of public housing in the Cleveland metropolitan area and noted that most of the conventional public housing in the area had been built inside Cleveland. A severe shortage of public housing was found to exist in the area, and this shortage was attributed directly to the exclusion of such housing from the suburbs. Parma was found to have a genuine need for public housing. Moreover, more than 1300 families living inside Cleveland and eligible for public housing had expressed an interest in moving to Parma. Parma had refused to participate in programs of the CMHA which would have brought low-income housing to the City. The district court determined that Parma's failure to seek and provide low-income housing was based on a desire to keep minorities out of the community and concluded that "Parma's opposition to any form of

public or low-income housing has had an acute and foreseeable segregative effect on this virtually all-white city." *Id.* at 1072. The court again rejected explanations for the City's actions put forward by the mayor in his testimony.

One of the acts which precipitated the citizens' suit was Parma's rejection of a proposal by a private builder to construct a federally subsidized multiple-family housing project to be called Parmatown Woods. Building permits for Parmatown Woods were denied after review by Parma officials. The stated reason for the denial was the developer's failure to comply with Parma's land use ordinances. The court found that Parma had not required strict compliance with all its ordinances and procedures in at least four other instances involving apartment projects, one a "luxury" multi-family development by the same organization which proposed to build Parmatown Woods. The court detailed the widespread opposition to Parmatown Woods revealed by the evidence and concluded that it was racially motivated. It was during pendency of the Parmatown Woods proposal that both the mayor and the president of the city council were found to have made public racist statements. *Id.* at 1079–80.

The district court stated its ultimate finding with respect to the Parmatown Woods denial as follows:

> The Court finds that an important reason for the denial of the building permits was the fear that blacks would live in Parmatown Woods. This fear resulted in deviations from standard procedure and substantive norms and rendered impracticable, if not impossible, compliance with the land-use ordinances.

*Id.* at 1074. The developers abandoned Parmatown Woods and built a similar project in a village adjacent to Parma.

The day before the Parmatown Woods application was rejected the voters of Parma adopted two land use ordinances by referendum. One ordinance limited all future residential structures to a height of 35 feet (Parmatown Woods, with 10 floors, would have been much higher) and the other required voter approval for the development, construction or acquisition of a subsidized housing project by a public body or participation by individuals or non-public bodies in any federal rent subsidy program. The initiative petitions which resulted in placing these ordinances on the ballot were circulated during the period when the Parmatown Woods proposal was being debated publicly. The court recognized that there had been opposition to high-rise construction in Parma for some time and that many residents opposed such construction for non-racial reasons. Nevertheless, the court found persuasive evidence to indicate that racial considerations were involved in the passage of both ordinances, and that their effect was to "make the construction of any public or low-income housing very difficult." *Id.* at 1088.

The government contended that two other Parma ordinances have a racially exclusionary effect. One requires 2½ parking spaces per dwelling unit and the other requires voter approval for any change in the zoning code or in existing land uses. The latter ordinance was adopted after this lawsuit was filed. Finding that the parking space requirement is abnormally high and that the voter approval requirement for zoning changes adds costly delay to the process of obtaining clearance to construct low-income housing, the court concluded that the effect of the ordinances was to perpetuate housing segregation. The court found, however, that there was no showing that either of these ordinances was adopted for the purpose of excluding minorities. *Id.* at 1089.

Parma applied for funds under the Community Development Block Grant program (CDBG) which is designed to bring federal funds for housing and community development to local governments. The Parma application was rejected by HUD because the City did not submit an adequate "housing assistance plan." In rejecting the application HUD found Parma's goal of "zero" for housing assistance to low-income persons to be inconsistent with demonstrated needs. The district court rejected explana-

tions for the City's refusal to correct the deficiency in the application. In doing so the court made credibility determinations. The finding on the issue of CDBG funds was stated thus:

The receipt of CDBG funds would have helped the City of Parma to provide an equal opportunity in housing for all races (Tr. 715). By rejecting the funds, Parma assured that it would continue to be an almost totally segregated community. The Court finds that Parma's submission of an inadequate CDBG application and its refusal to amend that application were intended to foreclose, and in fact have foreclosed, housing opportunities that would otherwise have been made available to all low-income persons, including blacks.

*Id.* at 1094.

In light of its findings of fact the district court concluded that a violation of the Act by Parma had been established:

The Court, after considering the evidence in its entirety, is convinced that Parma engaged in a pattern and practice of resistance to the full enjoyment of the rights granted by Sections 804(a) and 817 of the Fair Housing Act by following a consistent policy of making housing unavailable to black persons. The Court also finds that the City's actions denied the rights secured by Sections 804(a) and 817 to groups of persons. The Court's findings are based on both a standard of racially discriminatory intent and a standard of racially discriminatory effect. *See* pp. 1052–1055, *supra*. Under either standard, Parma's actions amounted to violations of provisions of the Fair Housing Act which forbid discrimination in housing on the basis of race.

The Court specifically finds that the rejection of the fair housing resolution, the consistent refusal to sign a cooperation agreement with CMHA, the adamant and long-standing opposition to any form of public or low-income housing, the denial of the building permit for Parmatown Woods, the passage of the 35-foot height restriction ordinance, the passage of the ordinance requiring voter approval for low-income housing, and the refusal to submit an adequate housing assistance plan in the Community Block Development Grant application, individually and collectively, were motivated by a racially discriminatory and exclusionary intent. The purpose of these actions, the Court finds, was to exclude blacks from residing in Parma and to maintain the segregated "character" of the City. These actions, individually and collectively, also violated the Fair Housing Act by denying to blacks, Parma residents, and prospective low-income housing developers rights secured by Sections 804(a) and 817.

*Id.* at 1095–96.

In reaching these conclusions the district court considered the public statements of elected city officials, the open hostility to low-income housing exhibited by residents and officials alike and departures from normal practices by subordinate city employees in handling the Parmatown Woods application.

C.

The district court entered a separate remedial order following submissions by the parties and a hearing. *United States v. City of Parma*, 504 F.Supp. 913 (N.D.Ohio 1980). The "comprehensive remedial plan" formulated by the court, *id.* at 916, contains a general injunction against discrimination in housing by the City and a number of affirmative requirements. The general provision permanently enjoined the City, its officers, etc. from:

1. Engaging in any conduct having the purpose or effect of perpetuating or promoting racial residential segregation or of denying or abridging the right of any person to equal housing opportunity on account of race, color, religion, sex or national origin;

2. Discriminating against any person or group of persons on account of race, color, religion, sex or national origin in connection with the planning, development, construction, acquisition, financing, operation or approval of any low-income or public housing units;

3. Interfering with any person in the exercise of his right to secure equal housing opportunity for himself or for others; and

4. Taking any action which in any way denies or makes unavailable housing to persons on the basis of race, color, religion, sex or national origin.

*Id.* at 918.

The defendant was additionally ordered to: (1) establish a mandatory fair housing educational program for all city officials and employees involved in carrying out the terms of the remedial order; (2) enact a resolution welcoming persons of all races, creeds and colors to reside in Parma and setting forth its policy of nondiscrimination in housing; (3) undertake a comprehensive program of newspaper advertising to promote Parma as an equal housing opportunity community and to make copies of the liability opinion and remedial order available, free of charge; (4) take "whatever action is necessary in order to allow the construction of public housing in the City," *id.* at 922; (5) adopt a plan for use of an existing "Section 8" housing program; (6) take required steps for submitting an acceptable application for CDBG funds; (7) "make all efforts necessary to ensure that at least 133 units of low and moderate-income housing are provided annually in Parma. This number is a threshold beyond which Parma must strive to go in providing new housing opportunities in the City. This is so because, in addition to addressing its current needs, Parma must address those low-income housing needs which have been in existence since at least 1968 but which have been ignored by Parma for racial reasons. This Court can require no less in carrying out its obligations in this action." *Id.* at 923 (footnote omitted).

In addition to the foregoing affirmative requirements the order contained provisions which invalidated the ordinance which required all low-income housing proposals to be submitted in a referendum and limited the other three ordinances in question so that they will not apply to hinder any development of low or moderate-income housing in Parma. The order also provided for the establishment of a fair housing committee within city government with specified functions and an evaluation committee to be appointed by the district court. Finally, the district court appointed a special master to see that the provisions of the order are carried out in an orderly manner. Seven "powers and functions" of the special master were set out in the order:

1. The Special Master shall oversee the formulation, by the Fair Housing and Evaluation Committees, of the remedial procedures to carry out the provisions of this Order. He shall evaluate the sufficiency as well as the practicability of these procedures in light of the purposes which they are intended to serve;

2. The Special Master shall be available, during the formulation process, on a regular basis, to give advice to and to serve as an arbitrator of possible disputes between the parties and/or Committees. All questions which the parties and/or Committees may have concerning this Order and their duties thereunder shall be directed first to the Special Master. Questions which cannot be resolved by the Special Master may be addressed directly to the Court;

3. The Special Master shall prepare and submit to the Court recommendations concerning the remedial plan prepared pursuant to this Order, together with any revisions or alternative plans which he deems necessary to carry out the Court's mandate in this action;

4. The Special Master may conduct such hearings and investigations as he deems necessary to the performance of his duties;

5. The Special Master may utilize the services, when necessary, of experts in various fields in performing his duties under this Order. The Special Master and such experts shall have complete and unrestricted access to the records of defendant City of Parma. They shall have free access to all Parma employees and staff. They shall be given notice of and free access to all meetings, public or pri-

vate, at which this Order and the remedial plan to be formulated hereunder are to be discussed. The Special Master shall determine the time and place of all meetings except those regularly scheduled governmental meetings whose time and place have been established by State law, local ordinance, or long-standing custom or tradition. Meetings set by the Special Master shall have precedence over all other business of the City. The Special Master shall preside over those parts of every meeting he attends which are, in his judgment, related to these Remedial Orders. The Special Master may bring official reporters to record and then to transcribe the minutes of said meetings, executive or otherwise. Records of executive sessions shall be held in confidence by the Special Master, his advisers, and the reporters, unless otherwise ordered by the Court. It is the intention of the Court that the Special Master's access to private meetings shall be interpreted broadly to include, for example, executive sessions and councilmanic caucuses;

6. With the consent of the attorneys for both parties, the Special Master may, as the need arises, contact and confer with the attorneys for the respective parties. If counsel for one party does not so consent, the Special Master may order a meeting with both parties;

7. The Special Master shall oversee the implementation of the ultimate remedial plan for this litigation and report to the Court, on a regular basis, concerning Parma's progress under this Order. Such report may contain recommendations, if necessary, concerning action to be taken by Parma to improve compliance with the remedial plan.

*Id.* at 925.

## II.

### A.

In this appeal Parma contests virtually every conclusion of the district court, though it does not claim explicitly that any subsidiary findings upon which those conclusions are based are clearly erroneous.

Instead, in its statement of facts the City relies on evidence which it introduced even though much of it was specifically rejected by the district court. Of course, this court cannot substitute its evaluation of the credibility of witnesses and the weight to be accorded various items of evidence for that of the trial judge. Our examination of the record on appeal convinces us that the findings of fact are not clearly erroneous. The City contends that many of the district court's findings involve mixed questions of fact and law and that because the district court used incorrect legal standards this court must review such findings fully, not limited by the "clearly erroneous" standard.

### B.

Some of the claimed errors refer either to jurisdiction of the court or to procedural matters.

1. The City contends that the district court had no jurisdiction to proceed in this case as a single-judge court. In its counterclaim the defendant alleged that the residents of Parma, as descendants of immigrants, had been subjected to discrimination and bigotry in the past by the government as well as by private persons and that the government had never attempted to alleviate this discriminatory treatment by way of affirmative action. The counterclaim charged the government with selective enforcement of the Act and requested that a three-judge court be convened to determine the constitutionality of the Act as applied to Parma and its residents.

Under 28 U.S.C. § 2282 (1970), which has been repealed but was in effect when this action was filed, a three-judge court was required to be convened if a pleading raised a substantial constitutional issue and sought to restrain the enforcement, operation or execution of an Act of Congress. The counterclaim in the present case did neither. It merely sought a declaration that the Act was unconstitutional as applied to a single community and its residents. *See Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963).

Furthermore, the constitutional claim was patently unsubstantial, if not frivolous. *See generally, Goosby v. Osser,* 409 U.S. 512, 93 S.Ct. 854, 35 L.Ed.2d 36 (1973).

2. Parma also asserts that the district court lacked subject matter jurisdiction because none of the provisions of the Act apply to governmental activities of municipalities. The City argues that neither the language of the Act nor its legislative history indicates a congressional intent to have it apply to municipalities.

We have examined the references to legislative history cited by both parties and find the history inconclusive. This is not surprising since Title VIII was added to the 1968 Civil Rights Act as a floor amendment. Thus, there is no committee report upon which to rely. While it appears to be true, as the City claims, that the Act was aimed primarily at the real estate industry, the legislative history does not establish with certainty that its operative provisions were not intended to be applied more broadly.

Turning to the language of the Act, it is apparent that its purposes were broadly stated. Section 801, 42 U.S.C. § 3601, states, "It is the policy of the United States to provide, within constitutional limitations, for fair housing throughout the United States." Many of the operative provisions of the Act are contained in § 804, 42 U.S.C. § 3604:

> § 3604. Discrimination in the sale or rental of housing
>
> As made applicable by section 3603 of this title and except as exempted by sections 3603(b) and 3607 of this title, it shall be unlawful—
>
> (a) To refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, or national origin.

> (b) To discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, or national origin.
>
> (c) To make, print, or publish, or cause to be made, printed, or published any notice, statement, or advertisement, with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on race, color, religion, sex, or national origin, or an intention to make any such preference, limitation, or discrimination.
>
> (d) To represent to any person because of race, color, religion, sex, or national origin that any dwelling is not available for inspection, sale, or rental when such dwelling is in fact so available.
>
> (e) For profit, to induce or attempt to induce any person to sell or rent any dwelling by representations regarding the entry or prospective entry into the neighborhood of a person or persons of a particular race, color, religion, sex, or national origin.

Parma contends that the use of "person" in the Act indicates an intent to reach only private transactions and practices in the real estate business. If Congress had intended to include municipalities, it is argued, it would have done so by specifying local governmental activities. The government answers that discriminatory acts of municipalities in the field of housing are proscribed by the language in § 804(a), "or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, or national origin." It argues that the acts of Parma which the district court found to violate the Act did "otherwise make unavailable or deny" dwellings to black residents of the Cleveland area who need low-cost housing.[3] Giv-

---

**3.** In addition to claiming that the City's actions violated § 804(a), the government asserts that denial of the building application for Parmatown Woods violated § 817, 42 U.S.C. § 3617:

§ 3617. Interference, coercion, or intimidation; enforcement by civil action

> It shall be unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoy-

en the broadly stated purpose of the Act and the fact that § 813 authorizes suit against the "person or persons" responsible for violations, the government argues that the Act reaches discrimination in housing regardless of the identity or nature of its perpetrator. It points out that "person" has been held to include municipalities in other civil rights acts. *See Monell v. New York Dept. of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).

The courts of appeals which have considered the question of whether a city may be sued under the Act have answered in the affirmative. *See United States v. City of Black Jack, Missouri,* 508 F.2d 1179, 1183-84 (8th Cir. 1974), *cert. denied,* 422 U.S. 1042, 95 S.Ct. 2656, 45 L.Ed.2d 694 (1975), where the issue was squarely decided. The same answer to the question is implicit in the decisions in *Resident Advisory Board v. Rizzo,* 564 F.2d 126 (3d Cir. 1977), *cert. denied,* 435 U.S. 908, 98 S.Ct. 1457, 55 L.Ed.2d 499 (1978), and *Kennedy Park Homes Ass'n v. City of Lackawanna,* 436 F.2d 108 (2d Cir. 1970), *cert. denied,* 401 U.S. 1010, 91 S.Ct. 1256, 28 L.Ed.2d 546 (1971). Furthermore, in *Village of Arlington Heights v. Metropolitan Housing Dev. Corp. [Arlington Heights I],* 429 U.S. 252, 271, 97 S.Ct. 555, 566, 50 L.Ed.2d 450 (1977), the Supreme Court, following a finding that the intent necessary to establish a constitutional violation had not been proven, remanded for determination of whether "a zoning decision made by a public body may, and that petitioners' [the village's] action did, violate § 3604 or § 3617." Upon remand the court of appeals found that a zoning decision of a public body can, and in the Arlington Heights case, most likely did violate the Act. The Supreme Court denied certiorari following the remand decision. *Metropolitan Housing Dev. Corp. v. Village of Arlington Heights [Arlington Heights II],* 558 F.2d 1283, 1290 (7th Cir. 1977), *cert. denied,* 434 U.S. 1025, 98 S.Ct. 752, 54 L.Ed.2d 772 (1978).

■ In agreement with the courts which have applied Title VIII to municipalities we conclude that the comprehensive purpose of the Act would be diluted if it were held to apply only to the actions of private individuals and entities. No intent to so restrict it may be gleaned from the language of the Act. On the other hand, § 815, 42 U.S.C. § 3615, provides in part "any law of a State, a political subdivision, or other such jurisdiction that purports to require or permit any action that would be a discriminatory housing practice under this subchapter shall to that extent be invalid." This provision is not self-executing, and would require legal action against the offending state or political subdivision for its enforcement. We believe it was the intent of Congress to provide for actions against states and political subdivisions for violation of § 804, § 817 and § 813 as well.

■ 3. Parma also maintains that the Attorney General lacked standing to bring this action. This argument is difficult to understand. Section 813 of the Act clearly authorizes the Attorney General to sue. The threshold requirement is merely that he have "reasonable cause to believe that any person or group of persons is engaged in a pattern or practice" of resistance to full enjoyment of the rights granted by the Act, or that denial of such rights to any groups of persons "raises an issue of general public importance . . . ." *See, e. g., United States v. Pelzer Realty Co.,* 484 F.2d 438, 444-45 (5th Cir. 1973), *cert. denied,* 416 U.S. 936, 94 S.Ct. 1935, 40 L.Ed.2d 286 (1974). The complaint pled the existence of both of the enumerated conditions and the district court found both to exist in fact. The City's argument appears to turn on its insistence that a municipality is not a "person" within the meaning of the Act. Since we have decided that the Act does apply generally to activities of municipalities, we see nothing in its language to indicate that a different interpretation should apply to pattern and practice suits brought under § 813.

ment of, any right granted or protected by section 3603, 3604, 3605, or 3606 of this title. This section may be enforced by appropriate civil action.

The district court found violations of both § 804 and § 817.

4. The final procedural argument of Parma is that this action was barred by the 180-day time limit contained within the Act.[4] The City contends that the triggering acts were passage of the voter-initiated ordinances on November 2, 1971 and rejection of the Parmatown Woods building permit application on November 3, 1971. The 180-day provision applies to civil actions by private persons where a discrete act of discrimination is alleged. A pattern and practice suit necessarily involves a number of discriminatory acts, not a particular one from which the time for bringing suit may be measured. *Cf. United States v. Mitchell,* 327 F.Supp. 476, 485 (N.D.Ga.1971). The charge is more like one of a "continuing violation." Our decision in *Warner v. Perrino,* 585 F.2d 171 (6th Cir. 1978), an action by a private individual, does not require a different conclusion.

## C.

The substantive contentions of the City are divided into three arguments, exclusive of those which deal directly with remedy.

1. The City argues that if the Fair Housing Act purports to apply to governmental activities of municipalities, it is unconstitutional. Support for this argument, it is claimed, is found in *National League of Cities v. Usery,* 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976). In that case the Supreme Court held that the Tenth Amendment prevents Congress from exercising its powers under the Commerce Clause "to directly displace the States' freedom to structure integral operations in areas of traditional governmental functions .…" *Id.* at 852, 96 S.Ct. at 2474. The holding in *National League of Cities* does not control the present case. The Fair Housing Act was not enacted pursuant to

the Commerce Clause. Rather it was based on authority of § 2 of the Thirteenth Amendment. *United States v. City of Black Jack, supra,* 508 F.2d at 1184; *United States v. Bob Lawrence Realty, Inc.,* 474 F.2d 115, 120–21 (5th Cir.), *cert. denied,* 414 U.S. 826, 94 S.Ct. 131, 38 L.Ed.2d 59 (1973). In *Fitzpatrick v. Bitzer,* 427 U.S. 445, 456, 96 S.Ct. 2666, 2671, 49 L.Ed.2d 614 (1976), the Supreme Court, speaking through Justice Rehnquist, stated "We think that Congress may, in determining what is 'appropriate legislation' for the purpose of enforcing the provisions of the Fourteenth Amendment, provide for private suits against States or state officials which are constitutionally impermissible in other contexts." (Citations and footnote omitted). The Thirteenth and Fourteenth Amendments were adopted following the Civil War and both were intended to limit the authority of the states. *Id.* at 453–55, 96 S.Ct. at 2670–2671. Congress acted within its constitutional authority in making Title VIII applicable to the states and their political subdivisions.

2. The City also contends that the district court erred in failing to follow the established law of this circuit. Two decisions of this court are relied upon principally: *Mahaley v. Cuyahoga Metropolitan Housing Authority,* 500 F.2d 1087 (6th Cir. 1974), *cert. denied,* 419 U.S. 1108, 95 S.Ct. 781, 42 L.Ed.2d 805 (1975), and *Joseph Skillken & Co. v. City of Toledo,* 528 F.2d 867 (6th Cir. 1975), *vacated and remanded,* 429 U.S. 1068, 97 S.Ct. 800, 50 L.Ed.2d 786, *decision adhered to,* 558 F.2d 350 (6th Cir.), *cert. denied,* 434 U.S. 985, 98 S.Ct. 611, 54 L.Ed.2d 479 (1977). While there is language in the opinions in the above cases which supports some of the arguments of Parma, particularly with respect to the scope of the remedy, the holdings of the

---

4. Section 812(a) of the Act, 42 U.S.C. § 3612(a), provides in part:

§ 3612. Enforcement by private persons
(a) Civil action; Federal and State jurisdiction; complaint; limitations; continuance pending conciliation efforts; prior bona fide transactions unaffected by court orders

The rights granted by sections 3603, 3604, 3605, and 3606 of this title may be enforced by civil actions in appropriate United States district courts without regard to the amount in controversy and in appropriate State or local courts of general jurisdiction. A civil action shall be commenced within one hundred and eighty days after the alleged discriminatory housing practice occurred.

cases are not controlling here. *Mahaley* was a suit under the Housing Act of 1937, not the Fair Housing Act of 1968. The two statutes are quite different in their purposes and structures. The 1937 Act was not concerned primarily with ending discrimination in housing—the clear purpose of the 1968 Act. The holding of this court in *Skillken* was based on a finding that no racial discrimination was shown to have been involved in the city's refusal to grant a rezoning request and that Toledo was not racially segregated. We hold that on the record before us the district court did not err in reaching a contrary conclusion in the present case. More important for present purposes is the fact that in *Skillken* this court did not base its holdings on a construction of Title VIII. In fact, the Fair Housing Act is not mentioned in any of the dispositive language of the opinion. We find the Supreme Court's decisions in *James v. Valtierra*, 402 U.S. 137, 91 S.Ct. 1331, 28 L.Ed.2d 678 (1971) and *City of Eastlake v. Forest City Enterprises, Inc.*, 426 U.S. 668, 96 S.Ct. 2358, 49 L.Ed.2d 132 (1976), cited by Parma in support of this argument to be equally inapposite.

3. Parma next argues that "the government did not sustain its heavy burden of proving its clear entitlement to an injunction, and the district court erred in determining liability under the Fair Housing Act . . . ." The City has repeated many of its earlier arguments in this portion of its brief. The primary thrust appears to be that the district court's conclusions with respect to segregation and racial discrimination in housing are unsupported by the record. Thus, the City asserts that none of the five grounds relied upon by the district court in granting relief furnishes a valid basis for its judgment.

■ (a.) The failure of the city council to adopt a resolution welcoming all persons of goodwill to Parma had only symbolic value, as the district court conceded. Certainly this failure alone would not have supported a finding of intent to exclude minorities from the City. However, there was ample testimony that Parma already had a reputa-

tion among black residents of the Cleveland area of hostility to racial minorities. Given the context in which the council debate and vote took place, we cannot hold that the district court erred in concluding that this event constituted part of a pattern or practice of official conduct which violated the Fair Housing Act.

■ (b.) The district court held that Parma unlawfully rejected public and low-income housing. Parma argues that it was not required to promote low-income or public housing. Two decisions are cited for the proposition that an action against a municipality for declining to include low-income or publicly financed housing in development plans fails to state a claim upon which relief may be granted. *See Acevedo v. Nassau County, N. Y.*, 500 F.2d 1078 (2d Cir. 1974); *Citizens Comm. for Faraday Wood v. Lindsay*, 507 F.2d 1065 (2d Cir. 1974), *cert. denied*, 421 U.S. 948, 95 S.Ct. 1679, 44 L.Ed.2d 102 (1975). Neither of these cases was brought by the Attorney General on the basis of a pattern or practice of discrimination. Further, there was no finding of discriminatory intent in the action of either local government. Finally, the actual holding in *Faraday Wood* was a narrow one—"that a city cannot be compelled to build and finance a specific housing project designated, in part, to aid low-income families or any specified group of its citizens simply because it started to plan such a project." 507 F.2d at 1071. Since the district court did not order Parma to build or finance a specific project this holding has no relevance to the present case.

The district court rejected Parma's explanation for failing to seek low and moderate-income publicly financed housing—that the CMHA was inept and the City did not want to deal with it. There was evidence of a number of programs in which Parma could have participated without becoming involved with the CMHA. The evidence of a need for such housing, both among Parma's residents and others in the greater Cleveland area who would consider moving to Parma, was unrebutted. The evidence supported the district court's conclusion that

this failure of the City was part of a pattern or practice of discrimination and resulted in large part from a decision to maintain Parma as a virtually all-white community. There is no requirement that such intent be the sole basis of official action, if it is a motivating factor. *Arlington Heights I, supra,* 429 U.S. 252, 265–66, 97 S.Ct. 555, 563–564.

(c.) The rejection of the Parmatown Woods project was justified, the City contends, because the developer failed to comply with some of the requirements for a building permit. This is technically correct. However, the evidence was clear that strict compliance was not required for other multiple-family developments. The deviations from customary practices in the case of Parmatown Woods consisted of a requirement of unusually strict adherence to the provisions of the Parma Planning and Zoning Code and a departure from the City's normal practice of accommodation with developers through informal negotiations. Departure from normal procedural requirements was identified by the Supreme Court in *Arlington Heights I, supra,* as a factor to be considered in seeking to learn the intent of a public body. *Id.* at 267, 97 S.Ct. at 564. The contrast between procedures followed in handling the application of Parmatown Woods and those of Parmatown Gardens and Parmatown Towers, two other multiple-family developments, was particularly striking. Informality and cooperation with the developer (the same developer in each case) were the essence of the attitude of Parma officers and employees in processing the Parmatown Tower and Gardens projects to successful conclusion. Significantly, neither was for low or moderate-income families. The same attitude appears to have prevailed with respect to Parmatown Woods in its early stages. Difficulties began to appear only after Parma residents and officials voiced questions about the development's occupancy and when it was made clear by HUD officials that residents in that project could not be limited to senior citizens or to Parma residents. The district court could properly conclude that the difficulties experienced with the Parmatown Woods project resulted from an intent to exclude minorities. This is particularly so in view of the public statements of two of the highest elected officials which occurred during the period when the application was pending.

(d.) We believe Parma's refusal to complete an acceptable application for CDBG funds presents the clearest evidence of the City's attitude. The very application form which was rejected for failure to include an adequate housing assistance plan revealed the need for low-income housing. The City wanted federal funds. The mayor's testimony is clear on this point. It is equally clear that the City decided to forego such funds for community development rather than accept federally assisted housing as part of the package. Of course, there is no general requirement that any community participate in the block grant program. However, in the context of this case, where a desire and need for federal development funds was admitted and no believable explanation for failure to pursue them was given, the district court was justified in finding that the reason for the city's failure to do so was rooted in an intent to exclude minorities which was part of the pattern or practice charged.

(e.) Parma contends that the district court erred in finding support for its conclusion that the City violated the Act in the four land use ordinances adopted by the City. The district court decided that no discriminatory motive was involved in enactment of the ordinances requiring 2½ parking spaces per residential unit and requiring a voter referendum for zoning changes. However, the court found that both had a discriminatory impact. On the other hand, the court determined that the ordinances prescribing height limitations for buildings and requiring voter referendum approval for public or subsidized housing were motivated, at least in part, by a desire to exclude minorities. The general right of local communities to control land use by zoning ordinances and regulations is not an issue in this case. The Supreme Court has upheld this municipal authority

against a variety of challenges over the years. *See, e. g., Village of Euclid v. Ambler Realty Co.,* 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926); *Village of Belle Terre v. Boraas,* 416 U.S. 1, 94 S.Ct. 1536, 39 L.Ed.2d 797 (1974). However, zoning decisions which have a racially discriminatory effect have been held to violate the Fair Housing Act. *City of Black Jack, supra; see Arlington Heights II, supra.* It was not impermissible to hold that Parma's zoning decisions were part of "a pattern or practice of resistance to the full enjoyment" of rights granted by the Fair Housing Act.

The findings of the district court on mixed questions of law and fact and its conclusion that Parma has violated the Act are amply supported by the record. We find no departure from proper legal standards in the determination of Parma's liability. The remedial order will be dealt with separately.

### III.

### A.

■ With respect to remedy, Parma asserts that the district court exceeded its authority in "appointing a special master, restructuring Parma's municipal government, supplanting elected officials and depriving its citizens of their cherished right to vote in referendum." In the district court's own words, it formulated a "comprehensive remedial plan" in this case. 504 F.Supp. at 916. Though the plan is comprehensive, and in some respects unique, the question for this court to decide is whether it is a suitable remedy for the violation which was found to exist. As in cases of constitutional violations, courts must carefully tailor the remedy in cases of statutory violations, limiting it to relief necessary to correct the violations. *Resident Advisory Board v. Rizzo, supra,* 564 F.2d at 149. The breadth of the remedial order does not, in itself, indicate that a court has exceeded its authority. As Chief Justice Burger wrote for the Supreme Court in *Swann v. Charlotte-Mecklenburg Board of Education,* 402 U.S. 1, 15, 91 S.Ct. 1267, 1276, 28 L.Ed.2d 554 (1971):

Once a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies.

> "The essence of equity jurisdiction has been the power of the Chancellor to do equity and to mould each decree to the necessities of the particular case. Flexibility rather than rigidity has distinguished it. The qualities of mercy and practicality have made equity the instrument for nice adjustment and reconciliation between the public interest and private needs as well as between competing private claims." *Hecht Co. v. Bowles,* 321 U.S. 321, 329–330, 64 S.Ct. 587, 591–592 (1944), cited in *Brown, II, [Brown v. Bd. of Ed.] supra,* 349 U.S. [294] at 300, 75 S.Ct. [753] at 756 [99 L.Ed. 1083].

### B.

■ Our examination of the remedial order leads to the conclusion that most of its provisions do represent a tailoring of relief to correct the statutory violations found by the district court. Injunctive relief is specifically authorized by section 813 of the Act and has been granted in cases involving violations by municipalities. *E. g., Park View Heights Corp. v. City of Black Jack,* 605 F.2d 1033, 1038 (8th Cir. 1979), *cert. denied,* 445 U.S. 905, 100 S.Ct. 1081, 63 L.Ed.2d 321 (1980). The four-part injunction entered by the district court does no more than prohibit activities of a type which the court has found to violate the Act by making housing in Parma unavailable to persons because of race. The district court did not abuse its discretion in granting this relief.

### C.

■ The affirmative provisions of the remedial order are not as unusual as Parma suggests in its brief. Most, if not all of those provisions have been incorporated in decrees of various courts which have decided Fair Housing Act cases. What is

unusual is to find such a wide range of affirmative requirements in a case where the defendant is a political entity. It is common in pattern or practice suits against private defendants to require educational programs for employees and advertising programs to advise the public of the nondiscriminatory policies which will be followed. *E. g., United States v. Youritan Construction Co.,* 370 F.Supp. 643, 652 (N.D.Cal. 1973), *aff'd in pertinent part,* 509 F.2d 623 (9th Cir. 1975); *United States v. Long,* 537 F.2d 1151, 1152 (4th Cir. 1975), *cert. denied,* 429 U.S. 871, 97 S.Ct. 185, 50 L.Ed.2d 151 (1976); *United States v. Warwick Mobile Homes Estates, Inc.,* 558 F.2d 194, 196 (4th Cir. 1977). We can see no objection to requiring an educational program to acquaint those officials and employees of the City who are responsible for carrying out the terms of the remedial order of their obligations thereunder. With respect to the requirement of advertising, we have found no case where a similar requirement has been imposed upon a city or other political entity. Unlike realtors and lenders, a city does not ordinarily carry on an advertising program to promote its activities. Nevertheless, on uncontradicted evidence, Parma's reputation as a closed community was found to be widespread in the Cleveland area. The advertising campaign ordered by the court, if of reasonable duration, should correct this image without imposing too great a burden on the City. However, this advertising material may only reflect the official attitude of the City as an equal opportunity housing community. It may not claim to reflect the private attitudes of the citizens of Parma, as suggested by the order. Private attitudes and opinions are not subject to official control.[5] The requirement that Parma adopt a welcoming resolution is relatively innocuous and fits in with the advertising campaign which we have approved.

The requirements that the City take whatever action may be necessary to permit construction of public housing, adopt a plan to utilize an existing section 8 program and take required steps for submitting an acceptable application for CDBG funds are reasonable. All respond to the needs of Parma as found by the district court and reflect evidence at the remedial hearing concerning the best means of correcting the violations found to exist. However, if the City should adopt a feasible plan to meet its needs for such housing without resort to programs specified in the order, it is to have this flexibility. The order is affirmed as written with this understanding.

The court affirms and strongly endorses the requirement that a fair housing committee be established within city government. This was described by a highly qualified witness, Paul Davidoff, as a major component of the remedial plan offered by the government. If this committee is thoughtfully constituted and functions in the manner envisioned by Mr. Davidoff, much of the tension and resentment which is evident among Parma residents and officials will be dissipated. This committee offers the best hope for a harmonious solution to the problems which this lawsuit has identified.

The requirement that Parma make all efforts to ensure that at least 133 units of low and moderate-income housing are provided each year is premature. Though this figure was suggested by a government witness, the same witness testified immediately thereafter that the fair housing com-

---

5. The dissent appears to overlook the limitations which we have placed on the City's duty to advertise. The only concern of this court is with the official actions of the City and its representatives. To the extent these official acts and statements have created a reasonable perception that Parma is officially committed to remaining a community where racial minorities have no opportunity to reside, it was a proper element of the remedy to require that publicity be given to the changed official policy. The dissent refers, with emphasis, to a statement in the district court remedial order that the community be informed that discriminatory practices no longer reflect the attitude of the citizens of Parma. This portion of the district court's order was not approved, and our opinion makes it clear that only the official acts and policies of the City are to be the subject of advertising.

mittee might find that a different number of units is required. In setting the 133-unit requirement the district court merely established a threshold figure and recognized that the ultimate burden of providing low and moderate-income housing in Parma "may indeed lie with the housing development community" rather than the City itself. 504 F.Supp. at 923. The City must take all necessary steps to see that the housing needs as described in the remedial order are met in a timely fashion. However, we believe that no particular number should be required at this time, but that a goal of meeting the need for such housing within a reasonable time should be established by the committee. Accordingly, the provision fixing a specific number of units is vacated.

■■■ The district court invalidated only one ordinance, the one requiring all proposals for low-income housing to be submitted to a voter referendum. The court found that this ordinance was racially motivated and that its effect would be to make it impossible to attract any such housing. Though invalidation of an ordinance is a strong remedy, it is not beyond the power of a court where necessary to correct a violation. *E. g., Park View Heights Corp. v. City of Black Jack, supra*, 605 F.2d at 1038. We affirm this portion of the order along with the provision which permits the other three ordinances in question to remain in force except as they apply to low or moderate-income housing. This provision tailors the relief to the violation, and intrudes as little as possible into the authority of the City.

With the exceptions noted we find no abuse of discretion in the provisions of the remedial order discussed to this point, and those provisions are affirmed.

### D.

■■■ As has been stated, the district court appointed a special master with specified powers and functions. This action was taken by the court upon its own motion. No government witness suggested a need for such an appointment and there was no provision for a special master in the proposed plan initially submitted by the government. The district judge stated that a special master is necessary for the resolution of the litigation to go forward in an orderly fashion. We find no support for this conclusion in the record. The government's chief witness on remedy, Mr. Davidoff, emphasized the necessity of getting the community of Parma involved in the task of making it a city where equal opportunity in housing would be a reality. He ascribed paramount importance to a local fair housing committee authorized to develop, monitor and implement the court's orders in this case. Davidoff stated that the "first principle" of planning a solution to a situation such as Parma's is that solutions take time. A different Parma cannot be created immediately by court order. The second principle, he testified "is that of giving maximum freedom to the local jurisdiction to develop its own solution, to try to not take away the basic rights that inhere in local government to develop its plans for its future growth." The imposition of a special master would appear antithetical to the recommendations of this witness. Mr. Davidoff said, "I think that the plan is in Parma's hands, at least in the first stage, according to my set of recommendations." Since the court largely adopted this witness's set of recommendations in its remedial order we can discern no reason for departing from the underlying philosophy of those recommendations which is to give Parma the first opportunity to correct the conditions which were found to violate the Act.

We can understand the district court's apprehension that too much of its judicial time will be taken up with administering details of the plan. We believe, however, that the court will be able to oversee implementation of the plan by working through the fair housing committee and the evaluation committee as suggested by Mr. Davidoff and as provided for in the remedial order.

The appointment of a special master to oversee implementation of a court order by

a municipality is an extraordinary remedy. We do not believe that such an appointment would represent the least intrusive method of achieving the government's stated goal in this case of making Parma a community which will offer low-income persons and members of minority groups some choice as to where they will live. The order appointing a special master is reversed.

The partial stay heretofore entered by this court, 644 F.2d 887, is dissolved. The judgment of the district court is affirmed in part and reversed in part as indicated in this opinion.

MERRITT, Circuit Judge, dissenting in part.

Judge Lively's opinion goes a long way in bringing order and clarity to this confusing and difficult case, but I do not find satisfactory that portion of the opinion which premises liability on the city's "image" or "reputation" and orders a comprehensive advertising program as a corrective means.

As I understand the court's various holdings, the fact that the city itself refused to plan, develop, sponsor or build public or low income housing is not a basis of liability under the Fair Housing Act. The primary bases of the city's liability, as found by the court, are:

(1) The mayor and certain members of the city council, including its presiding officer, through public statements and conduct, evidenced a general intent to exclude blacks from the city.

(2) In order to carry out this goal, officials of the city interfered in the market for low income housing by refusing to allow either private builders or public agencies such as the Cleveland metropolitan housing authority to supply low income housing within the boundaries of Parma.

(3) With discriminatory intent, these officials interfered with the supply of low income housing by refusing builder's permits for spurious reasons, and they promoted and adopted a policy requiring a city-wide vote by referendum on all local, state or federally subsidized housing.

I agree that the record supports a finding of liability on this basis.

After finding liability, the court then reverses the remedy of the District Court to the extent that it requires the city to develop, sponsor or build housing under the supervision of a special master. The basic remedy imposed by the court against the city is to order the city to stop its unreasonable interference in the market for public and private low income housing. The city and the fair housing committee are required to develop and submit to the District Court a plan outlining what regulation of these markets they consider reasonable and necessary. With all of this I agree.

I also agree with the court that the referendum provisions requiring a city-wide vote on individual housing projects is invalid. First, it seems clear that the effect, as well as the purpose, of this referendum provision is to keep out blacks, a discreet minority with no access to the political process in the City. The City is no more free to inflict deprivation upon this group by popular vote than by legislative act. Second, a popular vote is not a reasonable way to adjudicate individual rights of builders. It is not a procedurally fair method of adjudication because the individual or corporation denied a permit to enter the market is not entitled to a hearing or any explanation for the decision. Third, the record shows that the city does not want blacks, obviously a suspect classification subject to strict judicial scrutiny. There is no way for any reasonably precise analysis to be made of the reasons a particular applicant is denied the right to enter the market when the decision is made by the voting public in referendum. Principles of due process and equal protection, as well as the prohibition against discrimination in housing contained in the Fair Housing Act, combine to prevent adjudication by popular referendum of individual housing construction applications.

My problem with the opinion of the court is that it allows to stand the lower court's finding of liability based upon "the failure

of the city council to adopt a resolution welcoming all persons of good will to Parma," and the City's "reputation among black residents of the Cleveland area of hostility to racial minorities." (P. 574.) In order to remedy these wrongs, the District Court ordered the City to pass a welcoming resolution and adopt a comprehensive advertising program. The District Court in its remedial order provided:

C. *Fair Housing Resolution* ... Parma is ORDERED to enact a fair housing resolution *welcoming* persons of all races, creeds and colors to reside in Parma ....

D. *Advertisement of Parma as an Open Community* This court has found that Parma has perpetuated a racially exclusionary and discriminatory *image*. In order to eliminate *the perception of Parma in the Cleveland area, and in the minority community of Cleveland in particular, as a closed municipality*, Parma must implement an advertising program *promoting* Parma as an equal housing opportunity community. The purposes of this program are clear: To inform the community that (1) Parma is *seeking to become* an open community; (2) Parma is attempting to expand housing choice for minorities in the city; (3) All persons are welcome in Parma; (4) Discriminatory practices which have characterized Parma in the past *no longer reflect the attitude* of the city and its citizens.

Accordingly, it is ORDERED that Parma shall undertake *a comprehensive advertising program in newspapers* which circulate principally in the black community in the region, as well as in the major regional newspapers. The advertising campaign shall be directed at accomplishing the above stated purposes in addition to promoting Parma as a good place for persons of all races to reside.

(Emphasis added.)

Our Court's opinion appears to sustain this portion of the District Court's order. Our opinion states:

With respect to the requirement of advertising, we have found no case where a similar requirement has been imposed upon a city or other political entity. Unlike realtors and lenders, a city does not ordinarily carry on an advertising program to promote its activities. Nevertheless, on uncontradicted evidence, Parma's reputation as a closed community was found to be widespread in the Cleveland area. The advertising campaign ordered by the court, if of reasonable duration, should correct this image without imposing too great a burden on the City. However, this advertising material may only reflect the official attitude of the City as an equal opportunity housing community. It may not claim to reflect the private attitudes of the citizens of Parma, as suggested by the order. Private attitudes and opinions are not subject to official control. The requirement that Parma adopt a welcoming resolution is relatively innocuous and fits in with the advertising campaign which we have approved.

The Court cites no legal authority or persuasive reasons which support a municipal legal duty to adopt a "welcoming" resolution, or a municipal duty to create a particular image or reputation through publicity. How some residents of other suburbs of Cleveland may "perceive" Parma is not relevant to the City's liability. The law must try not to allow these kinds of general "image" and media considerations to direct its course. The federal court system should not get into the business of trying to change or improve its own or anyone else's image—whether Parma, blacks, General Motors or some agency of the government—by ordering the publication of favorable publicity in the press. We are not equipped to change the public's perception of a city by judicial order. Not only does it seem to me a futile exercise; I am unable to square such an order by a federal court with the first amendment.

The order requires officials of Parma, on behalf of the City in its capacity as the representative of its citizens, to affirm a

particular belief, to express and "promote" a particular racial "attitude" or political viewpoint—that "discriminatory practices . . . no longer reflect the attitude of the city and its citizens." The order requires them to express publicly an attitude of repentance for their old racial attitudes and to say that they have changed those beliefs. It is a violation of the first amendment for a federal court or other governmental entity to order anyone to express and print in the newspaper a particular racial attitude, political belief or social philosophy, however much most of us may agree with the viewpoint to be expressed. *Miami Herald Publishing Co. v. Tornillo*, 418 U.S. 241, 94 S.Ct. 2831, 41 L.Ed.2d 730 (1974) (invalidating Florida law requiring newspapers to grant political candidates right of reply); *Wooley v. Maynard*, 430 U.S. 705, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1977) (invalidating New Hampshire's requirement that automobile drivers display state motto "Live Free or Die" on license plates). The claims of liberty of conscience, thought and speech are given precedence in the Constitution over the claims of equality of opportunity in housing and where the two conflict, as here, the claims of liberty must be satisfied first. The freedom that exists in this country to state beliefs different from those of the prevailing majority gave birth to the civil rights movement. That movement cannot last long if, in the name of equality, it undermines the conditions of liberty which sustain it by requiring others to publish statements agreeing with its position.

Freedom of association is an aspect of freedom of speech and thought. To compel a particular statement about one's philosophy of association seems to violate the concept of free association even more than the Alabama state law requiring disclosure of NAACP membership lists which the Supreme Court invalidated because "compelled disclosure . . . may constitute a restraint on freedom of association." *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 463–64, 78 S.Ct. 1163, 1172–1173, 2 L.Ed.2d 1488 (1958). The line between forced association and the elimination of restrictions on the opportunity for blacks and whites to live together in a neighborhood—a distinction the federal housing act and this court are seeking to draw—may be at times a fine line. We do not in the long run foster the goals of association and racial cooperation by ordering cities to state new, and for some controversial, political attitudes.

The Court suggests that the labor law, notice-posting cases provide authority for such a broad publication order, but my review of the cases indicates that courts have studiously avoided making employers or unions do anything other than post notice or state to their employees that they will abide by the collective bargaining requirements of the Wagner Act. NLRB orders that employers go further and publish such statements in company or other publications, are routinely struck down, *Florida Steel Corp. v. NLRB*, 620 F.2d 79, 83 (5th Cir. 1980), as are orders requiring employers publicly to admit wrongdoing or promise a change of attitude, *NLRB v. Laney & Duke Storage Warehouse Co.*, 369 F.2d 859, 869 (5th Cir. 1966). Judge Learned Hand's comments in an early labor law, notice-posting case have not been overruled and seem equally applicable to the Parma publication order:

The employer must indeed post a notice that he will conform to the Board's order. . . . But we think that to compel him to say that he will "cease and desist", necessarily imports that in the past he has been doing the things forbidden; indeed we find it hard to see how the contrary can be rationally argued. Forcibly to compel anyone to declare that the utterances of any official, whoever he may be, are true, when he protests that he does not believe them, has implications which we should hesitate to believe Congress could ever have intended. At any rate until the Supreme Court speaks, we will not so construe the statute; nor are we disposed nicely to examine the scruples alleged; too long a history, and too dearly bought privileges, are behind such refusals.

*Art Metals Constr. Co. v. NLRB*, 110 F.2d 148, 151 (2nd Cir. 1940).

The fact that our Court now limits the publication order to the City of Parma as a corporation does not alter the first amendment violation. In the labor law cases, the publication orders run against the corporation. The first amendment protects corporations. *First National Bank of Boston v. Bellotti*, 435 U.S. 765, 98 S.Ct. 1407, 55 L.Ed.2d 550 (1978) (invalidating state restriction on political advertising by corporations). Certainly this coverage should include a corporation municipal which is ordered to express a political attitude in its capacity as the representative voice of a community.